568 A.2d 159

Charles MARTIN, deceased, Jean L. Martin, widow and Workmen's Compensation Appeal Board,

v.

KETCHUM, INC. and Ina Underwriters Insurance Company.

Appeal of Jean L. MARTIN.

Edward BENESKY, Appellant,

v.

WORKMEN'S COMPENSATION APPEAL BOARD (EDWARDSVILLE BOROUGH and PMA Insurance Company).

Supreme Court of Pennsylvania.

Argued Dec. 5, 1988.

Decided Jan. 4, 1990.

Reargument Denied May 16, 1990.

David W. Saba, Wilkes–Barre, for Edward Beresky.

Joel Persky, Pittsburgh, for Jean L. Martin.

Ralph J. Johnston, Jr., Kingston, for W.C.A.B.

Raymond F. Keisling, Carnegie, for Ketchum, Inc. et al.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION

ZAPPALA, Justice.

The issues raised by these two cases involve the standard to be applied in reviewing claims for mental disability under the Workmen's Compensation Act, Act of June 2, 1915, P.L. 736, as amended, 77 P.S. § 1 et seq. The cases were consolidated for argument, but will be addressed separately due to the distinctive nature of the factual circumstances underlying each case.

### 54 W.D. Appeal Docket 1988

This matter involves an appeal by Jean L. Martin from the Commonwealth Court's order reversing the order of the Workmen's Compensation Appeal Board (Board) affirming a referee's award of benefits to her for the death of her husband, Charles Martin.

On February 5, 1981, Charles Martin committed suicide. Appellee Jean Martin filed a fatal claim petition alleging that her husband's death from a self-inflicted gunshot resulted from job-related stress. At the time of his death at age 56, Martin was employed by the Appellant, Ketchum, Incorporated, as a professional fund raiser for non-profit organizations. Martin was employed by Ketchum from

1958 until his suicide. Although Martin's home was in Pittsburgh, his job required him to spend extended periods of time away at the location of a campaign.

In 1979, Martin was a Vice–President and Supervisor of Campaigns, directing a successful fund raising campaign at the University of North Carolina in Chapel Hill. Martin remained there for a period of four months. While he was located in North Carolina, Ketchum underwent several personnel changes in Pittsburgh. The individual who was then President was moved to a position as Chairman of the Board and one of the vice-presidents was promoted to President. Martin was very upset about the changes because he felt that the new president would not be as effective as his predecessor. Martin believed also that the changes would have a direct effect upon him personally and financially.

As a result of the changes, he went to the Chairman of the Board after completing the North Carolina campaign and requested that he be relieved of his supervisory responsibilities and assigned to campaign direction. The Chairman responded by saying that he could not think of a project that would be worthy of his talents. Within a few weeks, however, Ketchum "sold" a campaign to the University of Michigan. Martin was asked if he would consider becoming involved in that campaign. Martin accepted and was reassigned to the University of Michigan in January, 1980.

He encountered numerous problems at the University of Michigan. When he returned home on weekends, he spoke to his wife about his concern that the University's Vice–President of Development was not co-operating with him. He expressed his dissatisfaction with his staff, his inability to get an office, and the lack of campaign progress.

The campaign was a major project. For that reason, Martin was concerned with the lack of progress. He believed that it would enhance his reputation as a campaign director if he was successful. He became frustrated when it did not keep pace with his expectations.

Martin eventually contacted Ketchum's Pittsburgh office and suggested the Chairman of the Board come to the University to review the situation. The Chairman was David S. Ketchum. Mr. Ketchum agreed and met with the University's Director of Development, Dr. Michael Radock, on April 1, 1980 in Pittsburgh.

On April 9, 1980, Mr. Ketchum wrote a letter to Dr. Radock, reiterating his absolute confidence in Martin's ability to direct the University campaign. Mr. Ketchum emphasized the wealth of Martin's capital fund-raising experience as well as his great personal desire to serve the University. He explained that he felt that was what led Martin to press too hard in some of the personal relationships Radock had described to him.

The letter reflects that Martin's conflict with Radock arose out of their apparent battle of wills. Mr. Ketchum referred to lengthy, detailed discussions with Martin after the meeting, stating, "He [Martin] definitely understands that you are the University's vice-president in the area in which he is a consultant." (R. 73a). The letter outlined Mr. Ketchum's plan to become personally involved in the campaign and a proposed general planning session with a team of officers.

Shortly thereafter, a demand was made on Mr. Ketchum that a new director be assigned. Mr. Ketchum complied with the client's demand. An in-house memorandum prepared by Mr. Ketchum on April 14, 1980 indicated that he had advised Martin of the change and had explained that the client had agreed with him that Martin was an experienced, able director. The sole reason for the requested change was "chemistry."

After his return to the Pittsburgh office, Martin became frustrated because he felt he was not being utilized properly. He was subsequently assigned to a fund raising campaign for the Salvation Army in Pittsburgh. The campaign was not as extensive or prestigious as was the University campaign. It was also considered less stressful because it permitted Martin to remain at home.

Martin's complaints about the Salvation Army campaign were similar to those he had expressed about the University of Michigan—inadequate office space and insufficient staff. He was unhappy with the project. During this time, Martin continued to brood over the change in the University of Michigan campaign.

Prior to the start of the Salvation Army campaign, Martin began seeing a psychiatrist.[1] The psychiatrist prescribed medication. He continued seeing the psychiatrist until November or December of 1980. The Appellee described her husband as appearing over-medicated and in a stupor during that time. After discontinuing psychiatric treatment, Martin appeared happier.

Martin's job dissatisfaction was not the only difficulty that he was facing. His presence in Pittsburgh was considered positive as far as his personal life was concerned. He was experiencing problems with a teenage son. It was due to those problems that Martin brought two guns from his home for safekeeping at the office. He was apparently concerned with what might happen if the guns fell into his son's possession. Martin killed himself at his office by firing one of those guns.

Dr. Ralph Zabarenko, a psychiatrist, testified on behalf of the claimant. He opined that Martin had committed suicide as a result of an uncontrollable insane impulse and that his removal from the University of Michigan campaign played a substantial contributing role in the suicide.[2] His opinion was based upon an interview with and the deposition testimony of the Appellee and review of a report prepared by Martin's treating psychiatrist.

1. The treating psychiatrist did not testify in the Workmen's Compensation proceedings.

2. The psychiatrist's reference to an uncontrollable insane impulse is consistent with the articulation of the *Sponatski* test for determining whether a suicidal act was intentional. We rejected the *Sponatski* rule in *Globe Security Systems Co. v. W.C.A.B.*, 518 Pa. 544, 544 A.2d 953 (1988). Our holding in *Globe Security Systems* has not affected our consideration of the merits of the instant case for reasons stated infra.

Dr. Zabarenko's description of Martin is illuminating. He testified that Martin had enjoyed a successful career for many years, moving from one success to another. Despite his success, Martin was a "man who was chased by the specter of failure" to whom failure remained a great danger. Martin was described as a man whose view of himself was necessarily bolstered by continued, increasing success. When he did not meet with the expected success during the University of Michigan project, he suffered a decline in his self-esteem. Dr. Zabarenko indicated that Martin's drive to succeed was what made him a valuable worker for the corporation, but that Ketchum did not realize that it was dealing with a vulnerable person.

The most telling statement of Dr. Zabarenko is his personality profile description of Martin as a man whose overwhelming need for success existed long before the change in the Michigan project. He stated, "So that we have the outlines of a character structure existing for a number of years which has been pushed over the bridge by an act which was vulnerable." Although his employer's perception of Martin as a competent and successful fund raiser remained unchanged after the Michigan project, Martin's self-esteem faltered.

The referee granted benefits to the Appellee finding that Martin had sustained a work injury in the form of work-related stress which resulted in his suicide as a result of an insane, irrational impulse. The Board affirmed. On appeal, the Commonwealth Court reversed.

■ In an unreported opinion, the Commonwealth Court stated that as a matter of law, the work-related stress that the decedent experienced was not so abnormal or unusual as to impose workmen's compensation liability upon his employer. The Court noted that although the claimant had established the existence of stressful work conditions, the referee had not found that the events preceding the suicide constituted abnormal working conditions. Citing its decision in *Hirschberg v. Workmen's Compensation Appeal Board (Department of Transportation)*, 81 Pa.Cmwlth.

579, 474 A.2d 82 (1984), the Court noted that in order for an alleged work-related suicide to be compensable, a claimant must produce objective evidence that the working conditions were abnormal, i.e., actual, rather than merely perceived or imagined. Because the claimant had failed to meet her burden of proof, the suicide was not a compensable injury.

We granted allocatur to resolve the issue of the proper standard to be applied to claims of mental disability. The developing body of case law relating to this issue has been generated by the Commonwealth Court over the years, but this is the first time that this Court will have addressed the issue.

In *Globe Security Systems Co. v. Workmen's Compensation Appeal Board*, 518 Pa. 544, 544 A.2d 953 (1988), we reviewed the award of fatal claim benefits to the widow of a security guard who had committed suicide immediately after he had accidentally shot a robbery suspect. The employer had argued that the § 301(a) Workmen's Compensation Act, 77 P.S. § 431 prohibits an award of benefits whenever the injury is self-inflicted. Section 301 provides in part:

Every employer shall be liable for compensation for ... the death of each employe, by an injury in the course of his employment, and such compensation shall be paid in all cases by the employer, without regard to negligence.... Provided, That no compensation shall be paid when the ... death is intentionally self inflicted....

We held that the Workmen's Compensation Act does not prohibit an award of benefits in all cases where deaths are self-inflicted, but only in those cases where death is intentionally self-inflicted. The issue then was whether the security guard's suicide was preceded by a work-related injury. We noted that subsequent to the 1972 amendment of § 301, which deleted the phrase "violence to the physical structure of the body" from the definition of injury, the Commonwealth Court had expanded the concept of injury to include work-related mental injuries, as well as physical injuries, as compensable injuries. We concluded that the

referee correctly found that the suicide was preceded by a work-related illness—i.e., the severe mental disturbance the security guard suffered upon the accidental shooting of the suspect.

The third issue raised by the employer in that appeal was whether the Commonwealth Court had erred in abandoning the *Sponatski* rule and in applying the chain of causation test to establish the causal connection between the injury and the employment relationship. We rejected the *Sponatski* rule which would require a claimant to establish that the employee took his life while possessed by an uncontrollable impulse or while in a delirium or frenzy and that the employee was not aware of the physical consequences of his act.

In doing so, we adopted the chain-of-causation test, the elements of which were described by the Commonwealth Court in *McCoy v. Workmen's Compensation Appeal Board*, 102 Pa.Cmwlth. 436, 518 A.2d 883 (1986) to include:

> (1) that there was initially a work-related injury as defined by Section 301 of the Act; (2) which injury directly caused the employee to become dominated by a disturbance of the mind of such severity as to override normal rational judgment; and (3) which disturbance resulted in the employee's suicide.

We agreed with the Commonwealth Court that there was substantial competent evidence to support the award of benefits to the security guard's widow under that test. Although we were not confronted in *Globe* with the issue now before us, our opinion in that case is instructive because it focuses on the significance of the existence of a work-related injury and the element of causation as part of the claimant's burden of proof in establishing the compensability of a claim for benefits when an employee has committed suicide.

In the instant case, the Appellant contends that a claimant should not be required to establish that a mental illness was caused by abnormal working conditions in order to be compensable. The phraseology, "abnormal working

conditions", has been employed by the Commonwealth Court in this case and in prior decisions of that court to distinguish between objective and subjective evidence of the working conditions alleged to have caused the injury—i.e., the mental illness or mental illness ending in suicide. Review of that line of cases by the Commonwealth Court demonstrates that the phraseology describes the requirement that the claimant produce evidence establishing that the mental illness is in fact a work-related injury. The requirement is an objective one, rather than a subjective one.

It was in *University of Pittsburgh v. Workmen's Compensation Appeal Board,* 49 Pa.Cmwlth. 347, 405 A.2d 1048 (1979), that the Commonwealth Court noted that the 1972 legislative amendments to § 301(c) of the Workmen's Compensation Act abolished the requirement of an injury to the physical structure of the body. It held that due to that change, a work-related mental illness can be a compensable injury. Subsequently, in *Thomas v. Workmen's Compensation Appeal Board,* 55 Pa.Cmwlth. 449, 423 A.2d 784, 787 (1980), the Commonwealth Court held that evidence of an employee's subjective reaction to being at work and being exposed to normal working conditions is not sufficient to establish an injury compensable under this act, noting that "Due to the highly subjective nature of psychiatric injuries, the occurrence of the injury and its cause must be adequately pinpointed." *See also, Hammerle v. Workmen's Compensation Appeal Board (Department of Transportation),* 88 Pa.Cmwlth. 486, 490 A.2d 494 (1985); *Bell Telephone Co. v. Workmen's Compensation Appeal Board* (DeMay), 87 Pa.Cmwlth. 558, 487 A.2d 1053 (1985); *Evans v. Workmen's Compensation Appeal Board* (Anchor Hocking Corp.), 87 Pa.Cmwlth. 436, 487 A.2d 477 (1985).

The Commonwealth Court's approach was intended to distinguish psychiatric injuries that are compensable because the necessary causal relationship between the employment and mental disability has been established from those psychiatric injuries that arise from the employee's

subjective reactions to normal working conditions. The phraseology "abnormal working conditions" has developed into a shorthand expression for that critical distinction. As the Commonwealth Court stated in *Russella v. Workmen's Compensation Appeal Board (National Foam Systems, Inc.)*, 91 Pa.Cmwlth. 471, 497 A.2d 290, 292 (1985):

> A claimant must produce objective evidence which is corroborative of his subjective description of the working conditions alleged to have caused the psychiatric injury. Because psychiatric injuries are by nature subjective, we believe that if a claimant has met his burden of proving the existence of a psychiatric injury, he cannot rely solely upon his own account of working environment to sustain his burden of proving that the injury was not caused by a subjective reaction to normal working conditions. A claimant's burden of proof to recover workmen's compensation benefits for a psychiatric injury is therefore two-fold; he must prove by objective evidence that he has suffered a psychiatric injury and he must prove that such injury is other than a subjective reaction to normal working conditions.

We agree with this analysis.[3]

Abandoning the distinction between normal and abnormal working conditions, as the Appellant urges us to do, would eliminate the element of causation. It would destroy the fundamental principle underlying the scheme of the Workmen's Compensation Act—that, in order to be compensable, an injury must be work-related. Under the Appellant's theory, a claimant would have to establish only that the employee suffered from a mental illness while employed and that the illness was a condition created or aggravated by that employee's perception of the conditions of his employment. That would reduce workmen's compensation

---

**3.** Our acceptance of the Commonwealth Court's analysis should not be construed as approval of the Court's determinations of compensability in each of its prior cases. Review of the cases reveals decisions that we find incompatible. However, we do not find that to be a persuasive reason to distort the scheme of the Workmen's Compensation Act by extending benefits to these cases.

benefits to nothing more than a disability or death benefit payable only because of the employee status of the claimant—and not because the injury was caused by his employment.

■ In this case, Martin had built a successful career with Ketchum, Inc. spanning a period of twenty-one years. His removal from the University of Michigan campaign at the client's request did not change Ketchum's perception of his capabilities. There is nothing in the record to indicate that his involvement with the Salvation Army campaign was a vote of no-confidence by his employer. His assignment to that campaign resulted only from his unanticipated departure from the University of Michigan.

It was Martin's failure to meet his self-imposed expectations and his perception of success that caused him to take his life. What caused his death was not his employment; Martin carried the impulse of his own destruction with him always. What happened to Charles Martin is a lesson about the vulnerability of strong-willed, successful individuals. It is tragic. It is not compensable.

For these reasons we find that the Commonwealth Court correctly denied benefits to the Appellant in this case. The order of the Commonwealth Court is affirmed.

### No. 81 E.D. Appeal Docket 1988

■ Appellant Edward Benesky appeals from the Commonwealth Court's order affirming an order of the Workmen's Compensation Appeal Board which, in turn, had affirmed the referee's dismissal of his petition for compensation. Appellant had been employed as a full-time police officer for Edwardsville Borough from April, 1972 until February 17, 1982. At that time he was committed to Wilkes–Barre General Hospital's psychiatric ward. He was diagnosed as being a paranoid schizophrenic. Appellant attempted to return to his employment on a part-time basis after he was discharged from the hospital, but was unable to perform his duties.

Appellant filed a claim for workmen's compensation benefits, alleging that his paranoia was a work-related injury resulting from job stress. The referee dismissed his claim, finding that the Appellant had failed to meet his burden of proof of establishing that his condition was causally related to his employment. The Board affirmed.

On appeal, the Commonwealth Court affirmed. In an unreported memorandum opinion, the Court stated that the referee's finding that the Appellant's mental illness was not caused by his employment was supported by substantial evidence. The Commonwealth Court noted that the expert testimony of the parties was contradictory and that the credibility of the witnesses was for the referee to evaluate. Because the referee accepted the medical testimony of Dr. John Hume, the expert witness testifying on behalf of the employer, and rejected the testimony of the expert witnesses who testified for the Appellant, the Commonwealth Court did not disturb the referee's determination.

The Court refused to address the Appellant's argument that a claimant should not be required to prove that his mental condition is other than a subjective reaction to normal working conditions because the Appellant had not raised the issue before the Board. The Commonwealth Court concluded that the issue had not been preserved for appeal for that reason.

We do not find that the Appellant had failed to preserve the issue on appeal, but affirm nevertheless because the Board correctly determined that the referee's conclusion that the Appellant had failed to establish that his condition is causally connected to his employment was based upon substantial evidence.

The referee accepted as credible the testimony of Dr. John Hume. The diagnosis of the Appellant's condition was not disputed by any of the medical experts. As did each of the medical experts, Dr. Hume indicated that there is no consensus as to the cause or causes of schizophrenia. The difference of opinion among the medical experts focused instead on the emphasis that each expert placed upon the

role of the Appellant's responsibilities as an officer in the onset of the condition.

Dr. Hume opined that the Appellant felt stress from several sources, including his job, his marriage, and social contacts. He indicated that the Appellant's reaction was a subjective response determined by his life experience and his genetic makeup and background, rather than a response to any intrinsic or peculiar stress attributable to his position as a police officer.

After review of the record, we conclude that the referee's findings are supported by substantial evidence. Accepting those findings, we hold that the Appellant failed to establish that his psychological condition was causally related to his employment. The order of the Commonwealth Court is affirmed.

STOUT, Former J., did not participate in the decision of this case.

PAPADAKOS, J., files a concurring and dissenting opinion.

LARSEN, J., files a dissenting opinion.

PAPADAKOS, Justice, concurring and dissenting.

I dissent. I believe the record amply demonstrates that Martin's self-destruction was caused by his employment. He was, as the Majority suggests, a strong-willed, successful individual and when his strong will met resistance, *on the job*, in Michigan, he began to experience mental reservations concerning his *work* abilities. His subsequent reassignment to a less prestigious project for the Salvation Army campaign intensified his stress, *on the job*, and eventually led to his suicide. Clearly, the conditions of his employment brought about his death. I believe the referee and the Board correctly decided this claim and I would reverse the Commonwealth Court.

With respect to the Benesky appeal, I concur in the result reached by the Majority.

LARSEN, Justice, dissenting.

I dissent.

These two cases raise questions concerning the standards to be applied in granting workmen's compensation benefits for a mental disability. The decision of the majority in these cases violates the clear language, meaning and intent of the Workmen's Compensation Act, Act of June 2, 1915, P.L. 736, as amended, 77 P.S. §§ 1–1603, and will work a substantial injustice to numerous deserving claimants.

In the case at No. 54 W.D. Appeal Docket 1988, appellant Jean Martin's husband, Charles Martin, was employed by Ketchum, Inc., as Vice President and Supervisor of Campaigns. In 1979, he conducted a highly successful fundraising campaign for the University of North Carolina. On his next assignment he was sent to the University of Michigan to handle a similar campaign. There he encountered difficulties, and at the same time became concerned about certain personnel changes in Ketchum's home office in Pittsburgh. Martin was removed from the Michigan job and returned home, where he was demoted and assigned a very small campaign for the Salvation Army in Pittsburgh. This task was frustrating for him. Some time in 1980, he began to see a psychiatrist. Some months later, on February 5, 1981, Charles Martin shot himself to death at his desk at the Salvation Army building.

His widow claimed workmen's compensation benefits, alleging that his death was the result of work-related mental disability. The referee agreed, finding that Martin's mental condition was aggravated or precipitated by actual, not imagined employment events, and was the result of an irrational frenzy. The referee granted fatal claim benefits to appellant. The Board affirmed, but, on the appeal by Ketchum, Commonwealth Court reversed.

Commonwealth Court's decision reversing the award of benefits was confusedly supported by its "abnormal working conditions" rule. The court noted that although a suicide caused by work-related mental disability is compen-

sable under *University of Pittsburgh v. Workmen's Compensation Appeal Board (Perlman)*, 49 Pa.Commw. 347, 405 A.2d 1048 (1979), under *Hirschberg v. Workmen's Compensation Appeal Board (Department of Transportation)*, 81 Pa.Commw. 579, 474 A.2d 82 (1984), a claimant must have objective evidence of conditions that are *"abnormal*, i.e. actual, rather than merely perceived or imagined." Opinion of the Court at 3 (Oct. 30, 1987) (emphasis in original). Commonwealth Court went on to state that the referee in the instant case had not made a specific finding that the demotion and campaign events had constituted *abnormal* events. The court then held that, as a matter of law, the conditions that caused Charles Martin's psychic injury were not "so abnormal or unusual as to impose workmen's compensation liability upon his employer." *Id.* at 3–4.

In the case at No. 556 E.D. 1987, appellant, Edward Benesky, had been employed for 10 years as a full-time police officer when he was involuntarily committed to a psychiatric ward, and was diagnosed as a paranoid schizophrenic. After his release, appellant Benesky briefly resumed work as a police officer, but was unable to continue. Thereafter he filed a claim for compensation benefits, alleging that his paranoia was a work-related injury resulting from job stress. The referee made the following finding regarding one of appellant's experiences as a police officer:

> [Appellant] became extremely upset when he discovered a little baby that was badly beat up and black and blue. The Referee noted that [appellant] was very emotional as he described this incident and it does seem to have some effect upon him.

Referee's Finding of Fact No. 7 (Jan. 7, 1985). The referee found that appellant Benesky was disabled and that his disability was work-related. Nevertheless, the referee dismissed the claim because appellant had failed to prove that he had been exposed to "abnormal working conditions." *Id.* Findings of Fact Nos. 7, 9, 12, 15. On appeal, the Board affirmed, relying on *Hirschberg, supra,* for the proposition

that "[e]xposure to only normal working conditions result-
ing in a [mental] disorder is not a compensable injury under
the Act." Opinion of the Board at 2–3 (Mar. 20, 1986).

On review before Commonwealth Court, appellant Bene-
sky argued that the "abnormal working conditions" rule
was inconsistent with the spirit of the Act and hence should
be changed. Commonwealth Court found that this issue
had not been preserved for appeal because appellant had
failed to raise it before the Board. I agree with the
majority that Commonwealth Court erred in failing to ad-
dress the merits of this issue because there is evidence of
record that appellant did, in fact, raise this issue before the
Board.

Both of these cases raise essentially the same important
issue. Both appellants have asked us to consider the cor-
rectness and justice of the rules that Commonwealth Court
has developed in this area of the law.

The majority, by affirming the decisions of Common-
wealth Court herein, and by adopting the "abnormal work-
ing conditions" rule has substantially limited the class of
persons who will be able to recover compensation benefits
for mental disability claims. The Act makes *no* distinction
between mental and physical disabilities, yet the majority
exhibits an unarticulated but palpable bias against claims of
*mental* disability as contrasted with physical disability. I
believe that if the normal work events involved in *Martin*
had led to a heart attack, instead of a mental breakdown
that led to suicide, appellant would have been granted
benefits for her husband's death. Our rule in heart cases
only requires proof that the heart injury proceeded from the
claimant's normal work. *Krawchuk v. Philadelphia Elec-
tric Co.*, 497 Pa. 115, 125, 439 A.2d 627, 632 (1981). In
*Martin,* the referee found that appellant proved precisely
the same thing, i.e., actual events that precipitated the
breakdown.

In *Benesky,* appellant presented competent, unequivocal
medical evidence that his paranoid schizophrenia was
caused by stress to which he was subjected in the course of

his employment as a police officer. That stress took the form of specific work events, including the child abuse incident. If he had suffered a heart attack, he would have collected compensation.

All injuries (physical or mental) occurring "in the course of employment" that are "related thereto" are compensable under our compensation coverage formula. Nothing in the language of section 301(c)(1) of the Act[1] can be construed to exclude these workers, who suffered mental injuries, from coverage. Thus, the majority's imposition of the "abnormal working conditions" requirements in these mental injury cases is an impermissible judicial amendment to the Workmen's Compensation Act.

In the seminal case of *Thomas v. Workmen's Compensation Appeal Board (Atlantic Refining Co.)*, 55 Pa.Commw. 449, 423 A.2d 784 (1980), Commonwealth Court determined that a claimant had not proved a compensable injury because the only event pinpointed as the source of his mental disability was a non-work-related event, specifically a news report of a refinery fire. The court went on to note that the claimant's "fear" of a traumatic work incident similar to one that had occurred years earlier was a completely subjective reaction that was not related to any harm that was objectively measurable. *Id.* at 453–56, 423 A.2d at 787–88. Subsequently, in *Hirschberg, supra,* Commonwealth Court held that more than *subjective* reaction to normal working conditions must be shown to establish a compensable mental disability. In *Hirschberg, supra,* Commonwealth Court determined that a worker's honest, but mistaken, perception that his supervisor had harassed him could not give rise to a compensable injury. Commonwealth Court rejected the

---

1. Section 301(c)(1) provides in relevant part:
   (1) The terms "injury" and "personal injury," as used in this act, shall be construed to mean an injury to an employe, regardless of his previous physical condition, arising in the course of his employment and related thereto.... The term "injury arising in the course of his employment," ... shall include all other injuries sustained while the employe is actually engaged in the furtherance of the business or affairs of the employer ...
   77 P.S. § 411(1).

"subjective" standard of cases such as *Deziel v. Difco Laboratories, Inc.*, 403 Mich. 1, 268 N.W.2d 1 (1978), which had held that claimants could recover from mental injuries which were the result merely of a perceived work environment (e.g., which were based on delusions) rather than an actual work environment. The *Hirschberg* court held that a claimant must show "actual, and not merely perceived or imagined, 'employment events.'" *Hirschberg*, 81 Pa. Commw. at 583, 474 A.2d at 84–85.

Contrary, however, to the *Martin* panel's statement, *Hirschberg* contains *no reference at all* to the concept of "abnormal" working conditions. The *Hirschberg* court did reject a "subjective reaction" standard in favor of an objective standard, but the triggering work events to which the standard was to be applied were not required by the court in *Hirschberg* to be any more than actual work events.

In other cases, Commonwealth Court awarded benefits to claimants who could point to actual work events that precipitated mental disability. In *Bevilacqua v. Workmen's Compensation Appeal Board*, 82 Pa.Commw. 511, 475 A.2d 959 (1984), a worker who had encountered increased responsibility on a new job was awarded benefits when mental disability resulted. In *Allegheny Ludlum Steel Corporation v. Workmen's Compensation Appeal Board*, 91 Pa.Commw. 480, 498 A.2d 3 (1985), increased paperwork, loss of an assistant and an accumulation of work were sufficient to support a finding of compensability. In *McDonough v. Workmen's Compensation Appeal Board (Department of Transportation)*, 80 Pa.Commw. 1, 470 A.2d 1099 (1984), and *Bell Telephone Company of Pa. v. Workmen's Compensation Appeal Board (DeMay)*, 87 Pa. Commw. 558, 487 A.2d 1053 (1985), mental injuries resulting from stressful conditions that included public reprimands by supervisors were found compensable. In *Evans v. Workmen's Compensation Appeal Board (Anchor Hocking Corp.)*, 87 Pa.Commw. 436, 487 A.2d 477 (1985), however, an industrial engineer had difficulty from the start of his employment in completing his work. Commonwealth Court

in that case determined that his subsequent mental disability was not work-related where the claimant was disabled because he "felt" that his job was threatened, but where the record revealed that this fear was unfounded.

All of these cases were purportedly decided in reliance on the same distinction between "normal" and "abnormal" conditions. A close look at Commonwealth Court's language, however, and the facts of the individual cases supplies more accurate definition of the court's vocabulary. In those cases, Commonwealth Court actually seemed to be looking for *changes* in the *status quo* because they stood out in relatively high relief against the landscape of the job. These changes—new positions, disciplinary measures, new assignments, loss of assistants—were not *uncharacteristic* of the occupations of the injured workers; they could certainly be dubbed "normal" happenings. They were, however, work events that were seemingly more easily and objectively identifiable among the multitude of everyday work events. (This is reminiscent of the need to define "accident" before the statute was amended to eliminate the accident requirement.) Thus, I conclude that Commonwealth Court initially and properly approached "subjective" mental disability claims by emphasizing the distinction between actual and imagined workplace stresses as a way to pinpoint causation.

In *Evans* and *Thomas, supra*, the denial of benefits was clearly based on Commonwealth Court's determination that the claimant was disabled by a subjective fear that had no foundation in fact and connection to the actual work environment. The court was looking merely for some objective evidence of work connection. A noticeable change in the status quo is capable of being pinpointed more easily as a causal factor. The focus of the court's concern was not the "abnormality" of the stressful condition; that is, the court did not equate "abnormal" with the actual and the "normal" with the imagined. Rather, the essence of the court's analyses was the distinction between the actual and the imagined. Actual, concrete, describable work events that

could be located in time and space, and for which "objective" evidence could be available, were the *sine qua non.*

This test was not consistently applied at all times. The court in *Moonblatt v. Workmen's Compensation Appeal Board (City of Philadelphia)*, 85 Pa.Commw. 128, 481 A.2d 374 (1984), planted the seeds of the decisions that led to the majority's ruling today in the instant actions. In *Moonblatt*, Commonwealth Court determined that a lawyer who was disabled due to a work situation that included inadequate office space and help and a heavy caseload could not collect compensation *because such conditions characterized the work of many lawyers. Id.* at 130, 481 A.2d at 375. On the facts in *Moonblatt*, it was clear that the claimant could point to workplace events and conditions in his new position that triggered his breakdown and that were somewhat different from the ones the lawyer had previously experienced. Instead of holding consistently with *Bevilacqua, supra,* and *McDonough, supra,* that changes in, or specific pressures from, the workplace established the work connection, Commonwealth Court sought to compare the claimant with other workers in the same occupation.

The actual source of the "abnormal working conditions" language occurred not in any majority opinion of the Commonwealth Court, but in a *concurring and dissenting opinion* of Judge Doyle in the *DeMay* case, *supra.* Judge Doyle concurred in the denial of benefits to DeMay and dissented from the grant of benefits in a companion case. Pertinent to the cases at bar was Judge Doyle's formulation of the test he would have required the referee to apply on remand. He would have required a specific finding that the allegedly stressful conditions that produced the mental disability were "abnormal for the type of job claimants were performing." 87 Pa.Commw. at 569, 487 A.2d at 1058 (Doyle, J., concurring and dissenting). Judge Doyle went on to opine as follows:

By holding that a high stress work environment is, in and of itself, a sufficient work related abnormality, the

majority creates a dangerous precedent. Many types of jobs are, by their very nature, high stress. Such occupations as that of an air traffic controller, a school teacher in a ghetto area, or a police officer, for example, may well be viewed as high stress; but for these particular positions *high stress is normal.*

.    .    .    .    .

It is my view that for a high stress working environment to constitute a legally sufficient abnormal working condition there must be a finding either that claimant's work performance (as distinguished from the mere job description) was unusually stressful *for that kind of job* or a finding that an unusual event occurred making the job more stressful than it had been.

*Id.* at 569–70, 487 A.2d at 1058–59 (emphasis in original).

Thus, the "abnormal working conditions" rule has had a murky genesis, to say the least. In addition, the decisions reviewed above and cited as examples of the application of the "abnormal working conditions" rule were decided without reference to it by name or in substance. Commonwealth Court made a significant, and in this writer's opinion, an erroneous, shift from a standard that requires evidence of a connection between a worker's disability and an actual work event, to an inquiry about whether the individual worker is "abnormal" because he or she has suffered mental disability under conditions where the average worker does not. The majority of this Court compounds that error by adopting the latter standard, and it does so without addressing how that standard complies with the spirit of the Workmen's Compensation Act.

I believe that we are now in dangerous territory. No longer is the Court merely addressing the very real problems of proof of mental injury. Instead, the Court has adopted a test whereby the courts, as a matter of law, will judge whether a particular employee's mental fortitude is normal. Because most police officers, most production line workers, and most advertising executives do not have mental breakdowns when confronted with particular stressful

events, the Court has deemed, in effect, that those individuals who do suffer mental disabilities should have been able to withstand these pressures.

The danger here is that where normal working conditions, especially those of police officers, are of admittedly "high stress," individual claimants will succeed only if they show that they were confronted with virtually unimaginable and unpredictable events. Ultimately, the test will impose a standard of purported psychological normalcy. Even in cases where the referee finds that actual events triggered an actual injury, the claimant cannot recover. Although questionably qualified to do so, the majority would set itself (and compensation authorities) up to judge what kinds of stresses a "normal" police officer, advertising executive, or factory worker should be able to tolerate without breaking.

Clearly, we do not set up this kind of requirement in the realm of physical injury. The Workmen's Compensation Act no longer requires that a claimant be injured by "accident", and it has never required that the events or conditions causing physical injury be more than normal working conditions. The fact that *other* employees were not physically injured under particular circumstances that led to one claimant's physical injury is not relevant. The most recent applications of the test adopted today by the majority indicate that substantial injustices are being done to claimants who produce solid evidence of employment connection and who presumably would have qualified for compensation under the Commonwealth Court's initial version of the test for work-related mental disability.

The decision of the majority is at odds with the legislature's intent and the purpose of the compensation statute. The statute is intended to provide sure and efficient relief to those disabled because of their work. This humanitarian purpose is accomplished in part by foregoing a tort compensation scheme based on individual loss, in favor of a more generalized wage-replacement scheme. The statutory system, however, has always included important elements of individualization through which the system responds to the

differences and idiosyncrasies of individual workers. Thus, we have always, at least as far as physical injuries are concerned, taken workers as we find them. The decision of the majority herein directly contravenes this spirit and significantly shrinks the numbers of claimants who will recover for their disabilities.

We must reject the attempt to explain results in individual cases by reliance on the nostrum that a claimant has failed to show conditions "so abnormal" as to justify payment by the employer.

Accordingly, I dissent, and would reverse the orders of the Commonwealth Court denying workmen's compensation benefits to the appellants herein.