190

632 A.2d 1042

David M. KELLY, Deceased, Joleen Kelly, Widow, Petitioner

v.

WORKMEN'S COMPENSATION APPEAL BOARD
(P.P.G. INDUSTRIES, INC.), Respondent.

Commonwealth Court of Pennsylvania.

Argued March 1, 1993.

Decided Oct. 20, 1993.

Theodore E. Breault, for petitioner.

James D. Strader, for respondent.

Before COLINS and KELLEY, JJ., and KELTON, Senior Judge.

COLINS, Judge.

Joleen Kelly (petitioner), widow of David M. Kelly (decedent), petitions for review of an order of the Workmen's Compensation Appeal Board (Board) affirming the referee's decision denying petitioner's fatal claim petition under The Pennsylvania Workmen's Compensation Act (Act).[1]

The following factual background gave rise to this petition. From about 1970 to 1978, decedent worked for PPG Industries, Inc. (employer) as a laboratory technician testing paint, a job requiring no supervisory or decision-making responsibilities and in which decedent appeared to be contented. In 1978, however, decedent was promoted and given the job title of "chemist," which required that he make final decisions about

[1]. Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1–1031.

employer's automotive paint products in addition to testing them.

Petitioner alleges that after the aforementioned job change, decedent, believing that his job performance was unsatisfactory, began to exhibit considerable stress, anxiety, irritability, disturbed sleep patterns and alcoholic behavior. It is further alleged that decedent fixated on the fact that any mistakes on the job were solely his responsibility. On January 18, 1988, decedent committed suicide by a self-inflicted gunshot wound.

On October 13, 1988, petitioner filed a fatal claim petition alleging that as a result of abnormal working conditions, decedent had developed a mental illness that eventually led to his suicide. Although employer failed to file a timely answer to this petition, pursuant to Section 416 of the Act,[2] petitioner withdrew objections to this failure during the hearing before the referee held on March 23, 1989. At this hearing, petitioner testified and submitted deposition testimony from Dr. Robert Wettstein, a psychiatrist. Employer presented deposition testimony from two of decedent's co-workers (one of whom was a supervisor), as well as deposition testimony from Dr. David Spence, a psychiatrist. The referee made the following pertinent findings of fact and conclusions of law:

## FINDINGS OF FACT

4. The claimant widow further testified that the decedent claimant then could not sleep at nights, increased his alcoholic intake and became depressed in the first couple of years and that in 1985 and 1986 the decedent claimant had talked of killing himself and that he was not comfortable with the responsibilities and did not feel he was doing a good enough job. To the best of her knowledge, the claimant widow testified that the decedent claimant did not discuss these problems with PPG Industries but had asked

2. Section 416 of the Act, 77 P.S. § 821, provides, in pertinent part:
 Within fifteen days after a copy of any claim petition or other petition has been served upon an adverse party, he may file with the department or its referee an answer in the form prescribed by the department.

for an assistant indicating that he would rather be a second man rather than a first man of responsibility. The decedent claimant was given an assistant in early 1987. The claimant widow further testified that the day before his death, the decedent claimant cried and indicated that he should have been stronger at work and should have been able to tell employees about their mistakes....

5. The claimant widow also testified by deposition on April 5, 1989, on direct examination that three years prior to his death, the decedent claimant had said that maybe the best thing would be for him to kill himself as he did not feel he was doing a good job in the paint department and that the decedent claimant was a perfectionist. The claimant widow testified on cross examination on July 14, 1989, by deposition that the decedent claimant had a brother by the name of the [sic] Roger who was a psychologist at the Irene Stacy Mental Health Center in Butler. The claimant widow further testified that after the claimant mentioned committing suicide in 1985 or 1986 he never had any professional counseling or psychological help.... On recross the claimant widow testified that the decedent claimant had handed her a note on Saturday, January 16, which she no longer has but to the best of her recollection it indicated that to whoever finds me I will soon find out what life after death is all about or means and that he was scared....

On January 31, 1991, the referee denied the fatal claim petition, which decision was affirmed by the Board on July 21, 1992. This petition for review followed.

"Our scope of review is limited to determining whether constitutional rights have been violated, whether an error of law has been committed and whether all necessary findings of fact are supported by substantial evidence." *Archer v. Workmen's Compensation Appeal Board (General Motors)*, 138 Pa.Commonwealth Ct. 309, 313, 587 A.2d 901, 903 (1991).

Petitioner argues that the Board erred in disregarding objective evidence she presented establishing that when employer changed decedent's job to one involving supervisory

duties, decedent was subjected to greater responsibilities, longer work hours and abnormally excessive stress that resulted in decedent's depressed and disturbed mental state, and ultimately decedent's suicide. Petitioner also contends that the Board erred in affirming the referee's finding that the testimony given by employer's medical expert, Dr. Spence, was more credible than that of petitioner's medical expert, Dr. Wettstein. Petitioner bases this contention on the fact that Dr. Spence allegedly was unable to reach any conclusion as to why decedent took his own life, whereas Dr. Wettstein unequivocally testified that decedent's mental disorder was work-related and precipitated by job stress. Finally, petitioner maintains that the Board erred in failing to address the prejudicial effect of what she alleges to be employer's intentional destruction of critical personnel records of decedent that would have supported her claim that decedent sustained a psychic injury as a result of abnormal working conditions.

 In considering whether a psychic injury is compensable, this Court has set forth the following guidelines:

Pennsylvania has adopted an objective test for determining whether a psychic injury is compensable. When there is no physical injury as precursor to the psychic injury, the claimant must prove either (a) that actual extraordinary events occurred at work which caused the trauma and that these specific events can be pinpointed in time. Thomas v. Workmen's Compensation Appeal Board, 55 Pa.Commonwealth Ct. 449, 423 A.2d 784 (1980), or (b) that abnormal working conditions over a longer period of time caused a psychic injury. Pate v. Workmen's Compensation Appeal Board (Boeing Vertol Company), 104 Pa.Commonwealth Ct. 481, 522 A.2d 166, petition for allowance of appeal denied, 517 Pa. 611, 536 A.2d 1335 (1987), cert. denied, 484 U.S. 1064, 108 S.Ct. 1025, 98 L.Ed.2d 989 (1988). In Bevilacqua v. Workmen's Compensation Appeal Board (J. Bevilacqua Sons, Inc.), 82 Pa.Commonwealth Ct. 511, 475 A.2d 959 (1984), this Court held that a change in responsibilities at work may constitute abnormal working conditions. This type of case, however, is fact sensitive and requires a

determination by the fact finder as to whether or not, under the particular facts of the case, an internal change in employment creates an abnormal working condition. It is a mixed question of fact and law and is reviewable by this Court.

*Driscoll v. Workmen's Compensation Appeal Board (City of Pittsburgh)*, 134 Pa.Commonwealth Ct. 206, 213, 578 A.2d 596, 599–600 (1990).

Determining the presence or absence of abnormal working conditions relative to causation of a psychic injury was also recognized as a mixed question of fact and law in *Marsico v. Workmen's Compensation Appeal Board (Pennsylvania Department of Revenue)*, 138 Pa.Commonwealth Ct. 352, 588 A.2d 984 (1991), where this Court found that an undesirable physical condition of the work place was not "abnormal," although the employee may have perceived it as such. Similarly, when the record in the present case is reviewed in light of the law, this Court finds no substantial evidence to establish that an increase in job responsibilities, even if proven, constituted abnormal working conditions causing the decedent's visible mental disorder. The leading case in this regard, *Martin v. Ketchum, Inc.*, 523 Pa. 509, 517–19, 568 A.2d 159, 164 (1990) states:

> The phraseology 'abnormal working conditions', has been employed by the Commonwealth Court in this case and in prior decisions of that court to distinguish between objective and subjective evidence of the working conditions alleged to have caused the injury—i.e., the mental illness or mental illness ending in suicide. Review of that line of cases by the Commonwealth Court demonstrates that the phraseology describes the requirement that the claimant produce evidence establishing that the mental illness is in fact a work-related injury. The requirement is an objective one, rather than a subjective one.
>
> . . . .
>
> The Commonwealth Court's approach was intended to distinguish psychiatric injuries that are compensable because

the necessary causal relationship between the employment and mental disability has been established from those psychiatric injuries that arise from the employee's subjective reactions to normal working conditions. The phraseology 'abnormal working conditions' has developed into a shorthand expression for that critical distinction.

In the present matter, the record contains sufficient evidence to support the Board's affirmance of the referee's finding that decedent's depressive disorder was an inherent aspect of his personality and observable in his family life before he received his job promotion from employer. Specifically, the referee's findings of fact state:

5. ...The claimant widow additionally testified by deposition on January 5, 1990, with respect to a seven page letter that she had received from her decedent husband in 1983 which was attached as deposition Exhibit 1 in which the decedent claimant discussed his relationship with his mother and a girlfriend he had dated for approximately three years before going in the service when he received a letter from the girlfriend that she could not wait for him any longer and that she had found another guy. The decedent claimant had indicated that he was devastated and that if he had been brave enough he would have tried to take his life and that at times he thought he could be certified legally crazy.

In this regard, the foregoing testimony supports the referee's finding that decedent's deep-rooted mental disorder could not be attributed directly to new job responsibilities.

■ As to petitioner's argument that the Board erred in supporting the referee's credibility determination in favor of employer's medical expert over decedent's medical expert, we are bound by the referee's finding, because he is the ultimate arbiter of credibility if his findings are supported by substantial evidence of record. *Waldo v. Workmen's Compensation Appeal Board (Erie Metropolitan Transit Authority)*, 136 Pa.Commonwealth Ct. 264, 582 A.2d 1147 (1990). In the present case, the referee not only evaluated all medical testimony but also evaluated relevant testimony given by dece-

dent's co-workers as to the requirements of decedent's job, in making the following findings:

7. Dr. Wettstein reviewed the records and interviewed the claimant widow for 2 hours on November 10, 1989. . . . Dr. Wettstein opined that the dysthymic depression that the decedent claimant was suffering from prior to and [at] the time of his death was work related in that he was given managerial responsibilities and supervisory responsibilities which he believed he could not handle and that he did not have the mental or emotional capacity to handle.

. . . .

11. Hayden Powell testified by deposition on March 15, 1990, that he has been employed by PPG Industries for almost 15 years and that he is the director for technology for automotive refinish as his office is located in Strongsville, Ohio, a suburb of Cleveland and has held these duties since approximately April of 1982. . . . The witness testified that from 1982 until the decedent claimant's death in 1988, there was no change in his job duties other than he was asked to do more of it because their production did pick up and his job title changed as he had reached the top of his particular job class, the salary becomes capped and the decedent claimant was moved into other job classes so that he could continue to receive salary increases as he was a very conscientious hard worker and that was the only way to compensate him for his above average performance but that his basic job responsibilities did not change. . . . The witness further testified that he never received any complaints from the decedent claimant that his job was too much for him or that he wanted to change or that he could not handle it.

. . . .

13. Dr. David L. Spence testified by deposition on June 13, 1990, . . . as to the records he reviewed in the instant proceedings and opined that in regard to the decedent claimant's mental state, he was showing a mixed personality

disorder, characterized primarily by excessive compulsive traits, avoidant personality traits, passive dependent traits and dythymia [sic]. . . . Dr. Spence further testified that dysthymic is a term used for a personality that shows evidence of depression [3]. . . . Dr. Spence testified that he was not able to come to a conclusion as to why the decedent claimant committed suicide but that it is clear that there is not evidence of any external pressure, criticism or stress being placed upon him by his employer and . . . that any stress the decedent claimant was experiencing as a result of the job was internally generated, meaning that it was the decedent claimant's own perception of his adequacy that was causing him the stress . . . and there was no external confirmation of that of any kind. . . .

14. Your Referee accepts as credible the testimony of Hayden Powell, David Adams and Dr. David L. Spence, and finds as a fact that the claimant's mental illness was not caused by his employment and that the claimant's reaction by committing suicide was a subjective response determined by his life experience and his genetic make-up and background rather than a response to any intrinsic or peculiar stress attributable to his employment. Your Referee finds the Supreme Court of Pennsylvania Decision in the case of *Martin v. Ketchum, Inc.*, 523 Pa. 509, 568 A.2d 159 (1990) to be controlling which also was an alleged work related suicide in which it was found that the claimant's failure to meet his self-imposed expectations and his perception of success is what caused him to take his life and although it is tragic, it is not compensable.

Additionally, the referee, in concluding there was no causal link between decedent's job duties and his mental condition,

---

**3.** "Dysthymia" is a generally chronic condition which is one of a variety of mood disorders that laymen traditionally group together under the term "depression." For an excellent discussion of dysthymic depression and other mood disorders, see Robert M.A. Hirschfeld, M.D., and Frederick K. Goodwin, M.D., *Mood Disorders*, Chapter 13 in The American Psychiatric Press Textbook of Psychiatry 403 (John A. Talbott, M.D., et al. eds., 1988).

also evaluated petitioner's testimony during direct examination, a relevant portion of which follows:

Q. Did he talk to you on Saturday about what might be bothering him?

A. Only to say in his inability to move the furniture, his stumbling around out in the backyard trying to do these clay pigeons. I believe he did pick up his briefcase and got out some papers, too, to work on, but put them away again. . . .

. . . .

Q. You indicated that he was crying on Sunday. Can you tell me what the circumstances were that this came about?

A. He began to cry when he was talking about work, that had he been stronger, the mistakes would not have been made.

Q. What mistakes?

A. I took him to mean whenever a batch of paint did not work up properly. And from time to time there would be batches of paint that had to be put in the warehouse because they were not a sellable product. . . .

. . . .

Q. He wasn't the production superintendent, though?

A. No.

. . . .

Q. Do you know whether this was the first time that your husband had ever talked to his brother Roger about these emotional problems he was having?

. . . .

A. No. I would not say that my husband talked to his brother about any crisis situations in his life to any great degree, other than I know at one time not too long before my husband died, he expressed to Roger that he could not understand that—speaking in regards to himself—that I am

only responsible for paint. You are responsible for people's lives, but yet I feel it greater as far as if a problem occurs at work with paint. He could not understand how Roger could so easily handle his job when he dealt with life and death situations with the clients. He felt Roger handled it so much better than David [decedent] could handle the paint problems.

. . . .

Q. Why didn't you want him to go to work?

A. Because I quite obviously could see he was not feeling well.

Q. In what way could you see? What did he exhibit to you that he wasn't feeling well?

A. He made several trips to the bathroom. He walked through the house with his shoulders hung clear down. He walked over to the living room door and laid his forehead against the window. When I said to him about staying home, he's leaning against the window in the door saying, "I've got to go, I've got to go," . . . .

It is unarguable, therefore, that substantial evidence of record supports the referee's determination that petitioner failed to meet her burden of proving, by objective evidence, that decedent had been subjected to abnormal working conditions which, in turn, caused his suicidal mental condition.

■ Finally, in addressing petitioner's contention that the Board failed to consider the merits of her argument that employer deliberately destroyed the decedent's vital personnel records, we again note that substantial evidence of record supports the referee's decision on this issue. The record contains a June 7, 1989 letter from employer's counsel, setting forth the following reasons for chronological gaps in decedent's performance appraisals as found in his personnel file:

It is PPG's practice to keep only the three most recent evaluations for an employee. In Mr. Kelly's case these were dated June 1, 1987, September 30, 1985 and October 17, 1984. There was no evaluation with a date on it of 1986

because Mr. Kelly was promoted in May of 1986 and he would have had to have been on a job a year after that to receive a review. Thus, the review of June 1, 1987 and no review for 1986.

The series of evaluations for the years 1970 through 1974 were erroneously not destroyed and since they remained in his file at the time you had originally requested his personnel file, they were forwarded to you.

The referee found the above explanation credible and in this regard, "[t]he cases are too numerous to require citation on the principle that questions of credibility are for the referee and not the Board." *Archer*, 138 Pa.Commonwealth Ct. at 319, 587 A.2d at 906. We cannot now choose to ignore this principle, especially in the absence of any evidence presented by petitioner refuting employer's explanation.

In consideration of the above discussion, we find that petitioner neither presented any testimony from decedent's co-workers establishing that decedent was subjected to abnormal working conditions, nor evidence of any specifically pinpointed events indicating that decedent's dysthymic mood disorder was the result of anything other than his subjective reaction to normal working conditions and the product of non work-related personality factors. Accordingly, we are constrained to agree with the Board and the referee that petitioner failed to meet her burden of proof and that her claim, although indeed tragic is, nonetheless, not compensable.

## *ORDER*

AND NOW, this 20th day of October, 1993, the order of the Workmen's Compensation Appeal Board in the above-captioned matter is hereby affirmed.