A plaintiff claiming compensability for an occupational disease for stress-related symptoms must show a causal relationship to the job. The records and testimony of plaintiff's psychiatrist, Dr. Weaver, tended to relate his condition more to personal problem and preexisting tendencies. To the extent work stress may have incrementally affected plaintiff, it should be noted that to be compensable, it must be "other than a subjective reaction to normal working conditions." Martin v. Ketchum,568 A.2d 159, 164-65 (Sup.Ct.Pa. 1990); Cross v. Blue Cross/BlueShield, 104 N.C. App. 284, 289, 409 S.E.2d 103 (1991); Schmidt v.UNC-Charlotte, I.C. No. 910359, 4 January 1994; Frederick v. HavertyFurniture Co., I.C. No. 868906, 15 August 1990.
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, other than slight modifications, the Full Commission AFFIRMS and ADOPTS from the Opinion and Award of the Deputy Commissioner the following:
FINDINGS OF FACT
The following were entered into by the parties at the hearing before the Deputy Commissioner as
STIPULATIONS
1. At the time of the alleged injury by accident, the parties were subject to and bound by the provisions of the Workers' Compensation Act.
2. The employer-employee relationship existed between defendant-employer and plaintiff.
3. Relco Construction Company, Inc. was a self-insured employer with Consolidated Administrators as its adjusting agency.
4. Plaintiff's average weekly wage was $471.16.
5. Plaintiff was out of work from July 9 through November 26, 1991.
6. Since November 27, plaintiff has earned the following amounts: from November 27 through December 1991, $510.00; in January 1992, $648.00; in February, $570.00; in March, $568.00; in April, $1,271.00 and in May, $1,162.00.
* * * * * * * * * * *
Based upon all the competent credible evidence of record, the Full Commission makes the following additional
FINDINGS OF FACT
1. Defendant is a small company which has performed maintenance and repairs at apartment complexes. Paul Mulligan, the company president, has operated the business. Plaintiff began working for defendant at the end of 1981 as the maintenance supervisor. When he first started working there, the company had between 500 and 1,000 apartments to maintain, but business increased over the years to a maximum of between 4,000 and 4,200 units. As the work load increased, the number of employees under his supervision also increased.
2. Plaintiff's job duties included meeting with the maintenance employees in the morning and assigning the work orders to them, going out to perform certain repairs himself and handling any problems which arose which needed immediate attention. At the end of each work day, he would pick up the work orders for the following day and find out what his employees had accomplished during the day. He would then plan for the next day's work assignments.
3. It was necessary for someone to be on call during the nights and weekends in order to handle any emergency situations, and at first only plaintiff had this responsibility. Apartment managers began to call and wake him up at night over trivial matters, and he eventually complained to Mr. Mulligan. Mr. Mulligan then sent a memorandum to them and subsequently spoke to the worst offender, and there was some improvement in the situation. At some point Mr. Mulligan divided the on-call duty so that two other employees shared the responsibility and each person was on call one week out of three. However, because of his greater knowledge and experience, plaintiff was available to the other two employees during the weeks he was not on call to answer any questions they had. Therefore he continued to receive some calls at night even when someone else was on duty. Furthermore, some apartment managers would call his house when he would not respond to the pager.
4. In the summer of 1990, during a slow down in the construction work done by the company, Mr. Mulligan became more involved in the maintenance work and began to "help" plaintiff with his work. Although there was no harm intended, plaintiff found the assistance detrimental and believed that it interfered with his ability to supervise his men and to make effective work assignments. He spoke to Mr. Mulligan about the problem on a couple of occasions, and Mr. Mulligan tried to back away and work with him to resolve the issues. Despite any disagreements on how certain things should be handled, they had a congenial relationship.
5. On January 27, 1989 plaintiff and his wife separated after having been married approximately fifteen months. Without his knowledge, his wife had charged several thousand dollars on credit cards in his name. Although he denied that his marital problems were very stressful, that testimony was not credible.
6. On February 28, 1990 plaintiff began seeing Dr. Weaver, a psychiatrist, for symptoms of depression and anxiety. He reported that he was experiencing stresses in his life, primarily from the break up of his marriage and the resulting financial difficulties. At that visit, Dr. Weaver diagnosed his condition as an adjustment disorder with anxiety and depression and prescribed medication for him. However, at the next session in March plaintiff indicated that he had been having occasional panic symptoms over the previous eight months, so Dr. Weaver began to treat him for a panic disorder and changed his medication to Prozac. At that session plaintiff stated that his financial problems had been relieved because his father had loaned him some money.
7. When plaintiff returned to Dr. Weaver in April, he indicated that he had stopped taking the Prozac because it had made him nervous and that he had had a panic attack while at the theater on a date. Dr. Weaver prescribed different medication for him at that time. He did not report further panic attacks through May but described some panic symptoms when rushing to get a Mother's Day gift.
8. Dr. Weaver continued to follow plaintiff until June 1991. During the course of his treatment, he determined that plaintiff was somewhat of a perfectionist and that the panic attacks were most likely to occur in a crowded situation which was consistent with a diagnosis of agoraphobia. Plaintiff did not focus on his work situation as being stressful. He mentioned that the early morning meetings were difficult for him, and Dr. Weaver attributed his discomfort to his problems with being in a crowd. In July 1990 he also indicated that he was working a lot of overtime and was feeling exhausted. However, he did not describe panic attacks associated with work.
9. In June 1991 Dr. Weaver noted that plaintiff was doing pretty well but that he was continuing to experience some attacks despite the medication. At that time plaintiff decided to seek treatment elsewhere because he had not improved to his satisfaction and he had read an article in the newspaper about panic disorders which referenced another local doctor. He went to New Directions on July 29, 1991 where he saw Victoria R. Johnson, a clinical psychologist. By this date he had informed Mr. Mulligan of his problems and had stopped working. He stated that things were bothering him which he could not cope with and that he needed some time off of work. Mr. Mulligan allowed him to take the time off and continued his salary for two weeks.
10. Ms. Johnson obtained a significantly different history from plaintiff than Dr. Weaver had received. Plaintiff reported having one to two panic attacks each week as well as a lot of anxiety symptoms. He said that he was overwhelmed at work and under a lot of stress due to the number of tasks and the fact that he was always on call. Although he indicated that most of his attacks occurred when he was under stress at work and when he was traveling in a car, Ms. Johnson also noted that the attacks were unpredictable in nature. Her diagnosis was panic disorder with agoraphobia and secondary depression. She recommended that he undergo therapy with her and she referred him for appropriate treatment with medication to Dr. Steiner, a psychiatrist in the clinic. Dr. Steiner subsequently examined him and prescribed Prozac and later Xanax.
11. During the course of her therapy, Ms. Johnson determined that plaintiff had co-dependent personality traits such that he needed to please people and felt responsible for others' moods; he did not like to be the focus of attention or to be in crowds; and he had a fear of others depending on him. These traits, along with his tendency to be perfectionistic in his work, caused him to experience stress when faced with those types of situations. Ms. Johnson attempted to help him learn to cope and concentrated on relieving him of his anxiety while driving.
12. Plaintiff's condition improved with treatment and he returned to work in November, 1991. However, his job was changed so that he only handled the calls, did not work regular hours and had no supervisory responsibility. When he last saw Ms. Johnson on January 27, 1992 he was feeling strong and confident enough to look for other work. Nevertheless, he continued working for defendant through the date of his testimony before the Deputy Commissioner, October 13, 1992, in the part-time position.
13. By February 1990 plaintiff was suffering from a panic disorder with agoraphobia and symptoms of depression and anxiety. His panic disorder was characterized by panic attacks where he experienced the sudden onset of intense anxiety symptoms such as a racing heartbeat, chest tightness, sweating, hyperventilation, tingling or numbness of his extremities and the sensation of being overwhelmed. People with panic disorders are biologically predisposed to developing the condition, but other factors are involved in the onset of symptoms such as external stresses and the person's previous development of coping skills.
14. Plaintiff was not only biologically predisposed to developing a panic disorder, he was also sensitive to various situations due to his psychological make-up. His symptoms were triggered when he was under stress from the break up of his marriage and the resulting financial problems. Being in crowds and being the focus of attention were also associated with his problems. Although he testified that his work conditions were his primary stressor, in view of the history he gave to Dr. Weaver, that testimony is not accepted as credible.
15. Plaintiff was not placed at an increased risk of developing a panic disorder with agoraphobia and secondary depression by virtue of his employment with defendant as compared to the general public not so employed. The conditions of his employment with defendant were not a significant causal factor in the development of his psychological problems.
16. Plaintiff's panic disorder with agoraphobia and secondary depression was not proven to be an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment and which excluded all ordinary diseases of life to which the general public was equally exposed.
* * * * * * * * * * *
Based upon the foregoing findings of fact, the Full Commission makes the following additional
CONCLUSION OF LAW
Plaintiff is not entitled to compensation for an occupational disease because the psychological condition for which plaintiff has claimed compensation was not proven to be an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment with the defendant and which was not an ordinary disease of life to which the general public was equally exposed. G.S. § 97-52 and 53 (13); Anderson v.Northwestern Motor Company, 233 N.C. 372 (1951).
* * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
AWARD
1. This claim is hereby DENIED.
2. Defendants shall pay an expert witness fee in the amount of $315.00 to Dr. Steiner.
3. Each side shall pay its own costs.
 S/ ______________________________ J. RANDOLPH WARD COMMISSIONER
CONCURRING:
S/ ______________________________ COY M. VANCE COMMISSIONER
S/ ______________________________ FORREST H. SHUFORD, II SPECIAL DEPUTY COMMISSIONER
JRW/jss 1/31/95