578 A.2d 596

**Ronald J. DRISCOLL, Petitioner,**

**v.**

**WORKMEN'S COMPENSATION APPEAL BOARD (CITY OF PITTSBURGH), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs May 23, 1990.

Decided July 24, 1990.

John T. Bender, Bromall, Bender & Simon, Pittsburgh, for petitioner.

Marvin Miller, Baskin, Flaherty, Elliott & Mannino, P.C., Pittsburgh, for respondent, City of Pittsburgh.

Before DOYLE and COLINS, JJ., and BARRY, Senior Judge.

DOYLE, Judge.

Ronald Driscoll (Claimant) appeals an order of the Workmen's Compensation Appeal Board (Board) which affirmed a referee's denial of compensation for a psychiatric disability under Section 301(c) of The Pennsylvania Workmen's Compensation Act (Act).[1]

The issue, as presented by the Claimant, is whether the facts as found by the referee establish that the Claimant has met his burden of proving that he was subjected to abnormal working conditions. The referee found the following facts:

"1. On August 21, 1987, the claimant, Ronald J. Driscoll, filed a Claim Petition alleging that, as of April 25, 1987, he sustained psychiatric injuries rendering him unable to work. Claimant contends that his psychiatric injuries resulted from the policies of his employer and the employer's treatment of him.

"2. Claimant worked for the employer, The City of Pittsburgh, [for] approximately twenty-six years, from 1962 to 1987. The claimant began working for the employer in 1962 as a fire alarm operator with a group of approximately fifteen other workers and under the City's Department of Public Safety. Claimant's job as a fire alarm operator entailed receiving fire calls, dispatching equipment, and handling electrical problems, rectifiers, back-ups for the fire system, and various things connected with multiple alarms or gas conditions with regard to fire equipment and public safety. Claimant performed primarily the same job from 1962 until 1977.

"3. In 1977 the claimant experienced a job change and from 1977 through 1980, claimant worked as acting chief operator. Claimant's job as Acting Chief Operator entailed scheduling manpower, supervising modifications done on equipment changes inside, and disciplining personnel.

"4. In 1980, claimant's job title changed to Fire Dispatch Supervisor and he received a pay increase. Claimant's job

1. Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. § 411.

duties were primarily the same, but with a different title. Claimant worked as a Fire Dispatch Supervisor from 1980 until January 1, 1987.

"5. In 1986, a general city-wide reorganization of the City [Public] Safety Department occurred involving police, fire and other public [services]. The reorganization resulted in a combination of the fire dispatch services, 911 radio dispatch services, and index. After the reorganization, claimant was given supervisory capacity over both fire dispatch and police 911 dispatch. Claimant's title at that time remained that of Fire Dispatch Supervisor.

"6. Claimant was found to be credible when he testified that his job as a Fire Dispatch Supervisor was stressful and that his increased supervisory capacity over the police dispatch 911 increased the amount of stress, particularly because claimant was not familiar with police dispatch services, which are different from fire dispatch services. Claimant worked in that combined supervisory capacity until November 1986.

"7. In November of 1986, claimant was assigned to Re-act system, a computer system designed to handle some of the problems with alarm supervision. Claimant worked in the Re-act system from November, 1986 until May, 1987. Claimant was still classified as a supervisor, though his duties were no longer supervisory.

"8. On or about January 1, 1987, claimant was notified that in November the job as Fire Dispatch Supervisor would be eliminated and that claimant was to go back as a dispatcher, and back into the Union. From 1977 until the beginning of 1987, claimant had worked in a management capacity.

"9. On April 23, 1987, a new seniority list was published. Out of eighty positions, claimant's position was listed as seventy-two in terms of seniority. Claimant was found to be credible when he testified that of the seventy-two people ahead of him in seniority, most of them had worked for the city for six months to a few years, the longest having

worked for the city for approximately fifteen years. Claimant was found to be credible when he testified that many of the seventy-two workers listed ahead of him in seniority, were people that he had previously trained and supervised. Claimant was also found to be credible when he testified that the position of seventy-two on the seniority list meant that he lost bargaining rights, vacation picks, and pass day picks.

"10. At the beginning of May, 1987, claimant's work at the Re-act system began to wind down and he was required to go back to being a dispatcher.

"11. On May 13, 1987, the claimant sought medical attention from his family doctor, Dr. Bamonte, who referred claimant to a psychiatrist Dr. Christopher M. Erstling. Claimant saw Dr. Erstling on June 5, 1987 and again on June 16, 17 and 18, 1987.

"12. Claimant's last day of work for the employer was June 6, 1977 [sic]. At that time, claimant earned $27,180.00 per year.

"13. The claimant was admitted to St. Francis Hospital on July 2, 1987 and remained there until July 16, 1987. During his stay at St. Francis Hospital, claimant's attending physician was Dr. Melvin P. Melnick, a psychiatrist. Claimant continues to receive psychiatric treatment from Dr. Melnick.

"14. Melvin P. Melnick, M.D. testified on the claimant's behalf. Dr. Melnick's acute diagnosis of claimant was that of an adjustment disorder, meaning an emotional reaction in response to events. Dr. Melnick's second level of diagnosis of claimant was that of underlying personality disorder, which is a paranoid personality. Dr. Melnick opined unequivocally that the events which triggered claimant's adjustment disorder occurred at his place of employment.

"15. Dr. Melnick further opined that it is quite possible that if the same events at work occurred to someone who is not suffering from a paranoid personality disorder, there might be no resulting adjustment disorder. Dr. Melnick

opined that claimant's paranoia made him particularly brittle, that is, unable to view circumstances from different points of view creatively. Dr. Melnick opined that it would be very hard for anyone to move from being Supervisor to the bottom of the totem pole, but it might be possible for someone who is not paranoid to take a different view of life or to look for other sources of satisfaction.

"16. Dr. Melnick opined that claimant would never be able to work in the capacity of dispatcher to which he had been reassigned, because the psychopathology from which he had some relief would return and his paranoia would increase.

"17. When asked, on cross examination, how a reasonable person would have acted under such circumstances, Dr. Melnick opined that most people would not have reacted in the way claimant reacted. Dr. Melnick further opined, on cross-examination, that claimant's paranoia renders him likely to have a distorted perception so that things would seem worse to him than they might seem to a person who is not paranoid.

"18. Dr. Melnick further opined that claimant's paranoia has been a factor in his life for many years, but that paranoia can be a latent problem as long as there is not an nidus of truth around which the psychopathology can be elaborated. Dr. Melnick opined that the nidus of truth for claimant was losing the supervisory shield from that which he perceived to be the anger of those he supervised.

"19. Claimant provided no evidence of actual anger or ill will which may or may not have been directed toward him from those that he formerly supervised.

"20. Stewart S. Burnstein, M.D., a psychiatry specialist, testified on the employer's behalf. Dr. Bernstein [sic] examined claimant for psychiatric evaluation on October 8, 1987 and October 23, 1987. At the time of his examination of the claimant, Dr. Burnstein opined that he did not find claimant to have the diagnosis of adjustment disorder and opined that claimant had recovered from that if that had

been the case. Dr. Burnstein opined that claimant's paranoia personality disorder was still certainly prominent. Dr. Burnstein further opined that claimant's paranoia personality disorder was not the result of a work-related incident and that claimant has had a personality disorder for many years. Dr. Burnstein opined that claimant was exaggerating his symptoms, for example, of sleeplessness, and that he was either malingering or acting out a compensation neurosis. In other words, Dr. Burnstein opined, claimant is either presenting in the worse [sic] possible light or being driven to do so by the element of unconscious desire for compensation for assumed wrongs and seeming injustice.

"21. At the time of his examination of the claimant, in October of 1987, Dr. Burnstein opined that claimant was able to return to work for the Department of Public Safety on a trial basis. Dr. Burnstein opined that an adjustment disorder, by definition, is a six month limited illness and that claimant's adjustment order [sic] had sufficiently cleared up as of October 23, 1987. However, Dr. Burnstein opined that as of October 23, 1987, claimant was suffering and will continue to suffer from rage generated by his paranoid character disorder. Whether or not he could return to work would only be determined, Dr. Burnstein opined, by a trial period of duty in which his capacity for mastering the rage would be assessed by ongoing supervision and possibly through psychotherapy as well.

"22. When asked, on cross-examination, how claimant's work circumstances would impact on someone with an underlying paranoid personality, Dr. Burnstein opined that claimant's circumstances of being a supervisor demoted to the lowest possible position for seniority purposes would be a type of event that could trigger an adjustment disorder in a person with an underlying paranoid personality.

"23. When asked, on cross-examination, whether claimant's adjustment disorder aggravated his pre-existing and underlying paranoid condition, Dr. Burnstein opined that claimant's paranoid personality disorder "sort of fed his adjustment disorder condition, if you will, made it worse

perhaps, as it made him see the situation in even worst [sic] terms for himself."

"24. This Referee accepts the credible opinion of Dr. Melnick and finds that claimant suffered from a psychiatric injury in the form of a pre-existing and underlying paranoid personality disorder, that was aggravated or exacerbated by an adjustment disorder.

"25. Although the claimant has adequately identified actual employment events on or about April 23, 1987 which precipitated his psychiatric injury, this Referee finds that these events, while indicative of a significant change in job status, nevertheless do not constitute abnormal working conditions."

Pennsylvania has adopted an objective test for determining whether a psychic injury is compensable. When there is no physical injury as precursor to the psychic injury, the claimant must prove either (a) that actual extraordinary events occurred at work which caused the trauma and that these specific events can be pinpointed in time. *Thomas v. Workmen's Compensation Appeal Board,* 55 Pa.Commonwealth Ct. 449, 423 A.2d 784 (1980), or (b) that abnormal working conditions over a longer period of time caused a psychic injury. *Pate v. Workmen's Compensation Appeal Board (Boeing Vertol Company),* 104 Pa. Commonwealth Ct. 481, 522 A.2d 166, *petition for allowance of appeal denied,* 517 Pa. 611, 536 A.2d 1335 (1987), *cert. denied,* 484 U.S. 1064, 108 S.Ct. 1025, 98 L.Ed.2d 989 (1988). In *Bevilacqua v. Workmen's Compensation Appeal Board (J. Bevilacqua Sons, Inc.),* 82 Pa.Commonwealth Ct. 511, 475 A.2d 959 (1984), this Court held that a change in responsibilities at work may constitute abnormal working conditions. This type of case, however, is fact sensitive and requires a determination by the fact finder as to whether or not, under the particular facts of the case, an internal change in employment creates an abnormal working condition. It is a mixed question of fact and law and is reviewable by this Court.

■ In the case at hand, although it is true that the Claimant sustained a psychiatric injury in the form of an aggravation of his already existing personality disorder, there was no physical injury involved and therefore he had the burden of proving an abnormal working condition. The referee found that a demotion was not an abnormal working condition, however unjustified in this instance, and therefore that his injury was not compensable for workmen's compensation purposes. We agree and affirm the order of the Board. Relief for an unjust demotion or other unfair treatment by this employer, if such has been the case, lies elsewhere.

### ORDER

NOW, July 24, 1990, the order of the Workmen's Compensation Appeal Board in the above-captioned matter is hereby affirmed.

PELLEGRINI, J., did not participate in the decision in this case.