616 A.2d 91

**Robert LILLEY, Petitioner,**

v.

**WORKMEN'S COMPENSATION APPEAL BOARD (YORK INTERNATIONAL CORPORATION), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted June 5, 1992.

Decided Sept. 22, 1992.

Gary D. Martz, for petitioner.
Joseph W. Moyer, for respondent.

Before DOYLE and FRIEDMAN, JJ., and BARRY, Senior Judge.

DOYLE, Judge.

This is an appeal by Robert Lilley (Claimant) from an order of the Workmen's Compensation Appeal Board (Board) which had reversed a referee's decision which had granted benefits to Claimant for the closed period of time from January 20, 1987 through July 4, 1988 (except for five days when Claimant worked) for a psychic injury allegedly suffered while employed by York International Corporation (Employer).

The referee made the following pertinent findings:

(1) Claimant allegedly suffered a work related injury on December 23, 1986 while in the scope and course of his employment with Defendant/Employer.

(2) Claimant was employed as an engine lathe operator at an average weekly wage of $499.76.

(3) From 1966 until the end of June, 1986, Claimant worked on two manual lathe machines, the Monarch Lathe, from 1966 to 1972 and The Lodge and Shipley lathe, from then until the end of June 1986.

(4) In the end of June, 1986 Defendant changed Claimant's machine assignment to the American Tracer lathe machine, which is also an engine lathe, but is an automatic lathe which involves the use of a control box.

(5) When Claimant was changed from The Lodge and Shipley lathe to the American Tracer lathe, Claimant was also asked to train a machinist on his old machine, the Lodge and Shipley lathe.

(6) Claimant did not want to change engine lathes when Defendant changed Claimant to the American Tracer lathe and Claimant had difficulty in adjusting to the operation of the American Tracer lathe.

(7) In the fall of 1986, management for Defendant invoked a productivity improvement program for the company's employees.

(8) The productivity improvement program targeted approximately work stations [sic] which were of lowest productivity.

(9) For the individuals involved with the productivity improvement program, the program involved the setting of production goals and the monitoring of the employees performance with respect to those production goals and giving the employee written notices of unsatisfactory performance regarding his production performance during the six weeks that the program was in effect.

(10) Claimant was one of the individuals selected by Defendant to be involved in this [sic] production improvement program, although Claimant did not feel that he should be involved in the program.

(11) Claimant received his first written "notice of unsatisfactory performance" on December 9, 1986, which was given to him and signed by his supervisor, Curvin Eberly, III.

(12) Claimant was upset by his receipt of this written notice of unsatisfactory performance, did not agree with it, and refused to sign it.

(13) Claimant was particularly upset by the printed wording on the "notice of unsatisfactory performance" which indicated that his work was not satisfactory adn [sic] that if he did hot [sic] correct the problem, he may be subject to further disciplinary action.

(14) In his 21 years of employment for Defendant prior to December, 1986, Claimant had never previously received any written reprimands concerning his work performance, had never previously received any written notices of unsatisfactory performance, and had never been orally reprimanded concerning his work productivity.

(15) Claimant received a second written "notice of unsatisfactory performance" on December 18, 1986, which notice indicated that his productivity and performance for the previous week had not been satisfactory, and if the problem was not corrected that he may be subject to further disciplinary action.

(16) Following Claimant's receipt of the first two written "notices of unsatisfactory performance", Claimant became emotionally upset, depressed, and was having problems with is [sic] nerves.

(17) Claimant received a third "notice of unsatisfactory performance" on January 6, 1987 which addressed Claimant's productivity for the week ending December 21, 1986.

(18) Claimant then received a fourth written "notice of unsatisfactory performance" on January 15, 1987, covering the period ending January 11, 1987.

(19) Claimant was upset by and refused to sign all four of the written "notices of unsatisfactory performance", because he did not agree with them.

In addition, the referee found credible the testimony of Claimant's medical witnesses, Dr. Gary Ardison, Claimant's family physician, who opined that the working conditions in the fall of 1986 through January of 1987 caused Claimant's depression and resulting disability. Dr. George Lapes, a psychiatrist who treated Claimant, opined that the change in Claimant's working conditions "aggravated his pre-existing obsessive-compulsive personality, resulting in an adjustment disorder with anxious mood and depression" which disabled Claimant. Referee's Finding of Fact 26.

Employer presented the testimony of Dr. Abram Hostetter, a psychiatrist, who testified that Claimant had an "obsessive-compulsive personality disorder with some paranoid qualities, together with evidence of organic personality changes." Referee's Finding of Fact 29. He further opined that Claimant's condition was not due to work-related conditions at Employer's plant but rather to Claimant's pre-existing personality makeup. The referee specifically rejected Dr. Hostetter's testimony.

The referee concluded that Claimant had met his burden and granted benefits for the closed period of time, January 20, 1987 to July 4, 1988. Employer appealed and the Board reversed on the basis that Claimant had not demonstrated that abnormal working conditions had caused his disabling psychic injury. Claimant's appeal to this Court followed.

Where, as here, a claimant seeks to prove a psychic injury he must demonstrate that actual extraordinary events occurred at work which caused the trauma and can be pinpointed in time or, as Claimant has attempted to show, that abnormal working conditions over a longer period of time caused a psychic injury. *Driscoll v. Workmen's Compensation Appeal Board (City of Pittsburgh)*, 134 Pa.Commonwealth Ct. 206, 578 A.2d 596 (1990). This type of case is fact sensitive and requires an initial determination by the fact finder of whether an internal change in employment conditions has created abnormal working conditions. *Id.* Whether working conditions are abnormal is a mixed question of fact and law. *Id.*

In this case each party argues cases which it perceives as factually most analogous to the facts presented here.

Claimant relies upon *DeBaldo Brothers, Inc. v. Workmen's Compensation Appeal Board*, 49 Pa.Commonwealth Ct. 632, 411 A.2d 1277 (1980), and *Allegheny Ludlum Steel Corp. v. Workmen's Compensation Appeal Board (Fisher)*, 91 Pa.Commonwealth Ct. 480, 498 A.2d 3 (1985). In *DeBaldo* the claimant operated heavy machinery. He was also required to take customer orders and was frequently subjected to intervening and contravening orders from his employer. Additionally, in the summer of 1976 he was required at one point to operate two different pieces of heavy equipment which was an unusually stressful assignment. Thereafter, he suffered physical symptoms including blurred vision and chest and stomach pains and consulted his doctor in September of 1976. In early October his employer told him to disobey the orders of a customer and to leave the job site when he believed he should have remained. Thereafter, an argument ensued between the customer, the claimant and the employer. The claimant became a "nervous wreck" and his doctor prescribed a major tranquilizer which precluded him from operating heavy equipment safely. The claimant thus did not return to work until December 20, 1976, and was off work for a period of eleven weeks. He filed for benefits which the referee granted. The Board and this Court affirmed.

In *Allegheny Ludlum* a widow sought benefits after her husband committed suicide allegedly because of job-related stress causing a mental breakdown. The decedent had been employed as a shipping control clerk and was responsible for preparing documents to accompany materials to be shipped to customers. The claimant alleged that her husband's depression was due to (1) his regarding vacations as penalties because so much work accumulated during his absence; (2) his loss of an assistant; and (3) computerization in his office which increased his paper work. The referee granted benefits and the Board and this Court affirmed.

Employer cites *Evans v. Workmen's Compensation Appeal Board (Anchor Hocking Corp.)*, 87 Pa.Commonwealth Ct. 436, 487 A.2d 477 (1985), and *Supinski v. Workmen's Compensation Appeal Board (School District of Philadelphia)*, 133 Pa.Commonwealth Ct. 631, 577 A.2d 944 (1990). In *Evans* the claimant, an industrial engineer, suffered a breakdown allegedly due to employer harassment. The so called harassment was in fact counselling sessions where the claimant was encouraged to work up to his potential and to communicate more about his work. At no point was he threatened with termination. The referee granted benefits. The Board reversed and we affirmed that reversal explaining that the claimant's honest, albeit mistaken, perception of job harassment could not constitute a legal basis for the grant of benefits.

In *Supinski*, the claimant, a teacher with a B.S. and M.S. in Education and Special Education, was employed by the School District of Philadelphia. For several years she taught, at three different locations, "low functioning retarded trainable children" who were docile and cooperative. She was then transferred to a position where she taught learning disabled children who had normal IQ's but were aggressive, combative and noncooperative. She began not sleeping well and not communicating with her family. She was then transferred again to another position involving learning disabled children who were also aggressive. A month later she resigned. She then sought workmen's compensation benefits which the referee granted. The Board reversed and we affirmed that rever-

sal. On appeal we held that while claimant was assigned to different classrooms with different students, the nature of the job duties remained essentially the same and all assignments were within her area of certification. We thus concluded that her work experiences were not abnormal.

 While we are not convinced that the cases relied upon by the parties can be entirely reconciled with each other,[1] we believe that the proper legal formula to be employed in this case is that adopted by our Supreme Court in *Martin v. Ketchum, Inc.*, 523 Pa. 509, 568 A.2d 159 (1990). Under this analysis the claimant, in order to be entitled to benefits, must prove by objective evidence that he suffered a psychic injury which was not caused by a subjective reaction to normal working conditions. Here, the cause of Claimant's upset was his dissatisfaction and disagreement with notices of unsatisfactory performance which he subjectively believed were unjustified. The findings, however, do not demonstrate

1. In *Martin v. Ketchum, Inc.*, 523 Pa. 509, 519 n. 3, 568 A.2d 159, 165 n. 3 (1990), our Supreme Court held that this Court's case law on mental injuries contained "incompatible" decisions some of which had granted benefits erroneously; and our decision in the *University of Pittsburgh v. Workmen's Compensation Appeal Board*, 49 Pa.Commonwealth Ct. 347, 405 A.2d 1048 (1979), was specifically discussed in the text of *Martin*. While it is not necessary for this Court to now determine which specific decision, or decisions, of this Court the Supreme Court was referring to in footnote 3, we note in passing that *DeBaldo Brothers Inc.* was decided ten years prior to *Martin*, and relied upon the *University of Pittsburgh* decision as authority for the principle that "a work-related nervous disability is a compensable injury within the meaning of Section 306(c) of the [Act]." The *University of Pittsburgh* appeal involved a claim for death benefits after the employee committed suicide and rested upon a referee's finding that "the deceased's death was caused by working conditions *peculiar* to his employment and that his suicide was the result of a delirium frenzy caused by the psychotic depressive reaction caused by and arising within his employment." (Emphasis added.) The "irrational frenzy" test has, of course, now been abandoned in Pennsylvania in favor of a "chain-of-causation" test, *McCoy v. Workmen's Compensation Appeal Board (McCoy Catering Services, Inc.)*, 102 Pa.Commonwealth Ct. 436, 518 A.2d 883 (1986).

We do believe that the *DeBaldo* decision, as well as the decision in *Allegheny Ludlum*, which was decided five years prior to *Martin* and which involved the claimant's *perception* that the employer was punishing him, were two of the decisions to which the Supreme Court made reference in footnote 3 in *Martin*.

that Employer's analysis of Claimant's performance was inaccurate, nor, even if inaccurate, that it was an abnormal working condition. Therefore, we conclude that Claimant's reaction to his working conditions was a subjective reaction to normal working conditions as a matter of law.

Affirmed.

## ORDER

NOW, September 22, 1992, the order of the Workmen's Compensation Appeal Board in the above-captioned matter is hereby affirmed.

BARRY, Senior Judge, concurring.

I concur in the result in this case but I believe that footnote 1 is speculative and unnecessary. I realize that the majority opinion believes the footnote is for the benefit of the Commonwealth Court, and the practicing bar, referees and the Board. I am not sure a proper benefit will result from what amounts to unnecessary dicta.