647 A.2d 669

**Jack E. MORRIS, Petitioner,**

v.

**WORKMEN'S COMPENSATION APPEAL BOARD (SCHOOL DISTRICT OF PHILADELPHIA), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs May 13, 1994.

Decided Aug. 29, 1994.

172

Jack J. Morris, petitioner, pro se.

Jan M. Ritchie, for respondent.

Before CRAIG, President Judge, and NEWMAN, J., and DELLA PORTA, Senior Judge.

CRAIG, President Judge.

Claimant Jack Morris appeals an order of the Workmen's Compensation Appeal Board affirming a referee's decision denying the claimant's petition for workmen's compensation benefits for work-related psychiatric injury.

The claimant presents the following issues for review: 1) whether the claimant met his burden of proof that he suffered a compensable psychiatric injury; 2) whether the School District of Philadelphia (employer) violated the claimant's First and Fourteenth Amendment rights under the United States Constitution; 3) whether the board violated the claimant's due process rights; 4) whether the board, in making its decision, relied on statements made in the employer's brief, which the claimant contends are erroneous, and 5) whether the employer is estopped from contesting the claimant's claim petition because of oral representations which the employer made during and after settlement negotiations.

## FACTS

The facts, as found by the referee, follow. The claimant worked for the employer as a teacher of French from 1964 to January 17, 1986. In 1979, the claimant taught French at George Washington High School, where he founded an organization called "For A Better America (FABA)," in order to express his point of view and concerns regarding education in America. The claimant's concerns included "policies regarding deficient educational standards in inner-city schools, busing and desegregation." Finding of Fact No. 2.

On June 20, 1979, Dr. Carol Walker, the principal of George Washington High, sent the claimant a letter reprimanding the claimant for using the employer's supplies and reproduction equipment to reproduce and distribute material for FABA.

In November of 1982, the claimant, who is white, met with the parents of one of his black students at a routine confer-

ence. The parents of that student explained to the claimant that their son had been late on numerous occasions because he was bussed quite some distance from the school. The claimant suggested that the parents 1) enroll the student in a school closer to where they lived, and 2) demand from the school board that all schools in Philadelphia be made "good schools." The student's parents, apparently offended by the claimant's comments, removed their child from the claimant's class and demanded that the employer fire the claimant.

The claimant then mailed a FABA four-page newsletter to the above student's parents. The claimant addressed the newsletter to Mrs. "Goodperson," a name other than that of the student's mother, and expressed shock in the newsletter, that "Mrs. Goodperson" had removed her son from his class because the claimant had objected to the student being bussed from such a distance to the school. In addition, the newsletter expressed the claimant's view on certain issues like education in black neighborhoods, bussing, desegregation, and education in America in general. The newsletter stated:

> I did not tell you he was not welcome in our school. In light of your son's abominable record, not only in my class, but in all his classes, I consider the special privilege given you as a blatant violation of the civil rights of the students who do arrive on time and have had their instruction interrupted so often by Dwight's lateness.

> .    .    .    .    .

> I had your son as a student for less than three months. You were his teacher for over thirteen years. What did you do wrong to cause him to fail every single subject except English which was 75?

> .    .    .    .

> Mrs. Goodperson, let's be realistic. Your son and the public schools across the nation do not need integration; they need education, tough love education. *No one in his right mind is going to send his child into a school overloaded with*

*performers such as your son. YOU DIDN'T!* (Emphasis in original.)

(R. c–3, pgs. 1–2.)

The newsletter also stated that the claimant is not racist as to black persons, but that forced bussing to schools like Washington High, which are located in suburban areas, in order to achieve racial integration, is destroying inner-city public schools like those in the black student's neighborhood.

The referee found that the newsletter had been circulated in the school. The claimant testified that he could not understand why the student's parents had taken offense at the newsletter.

On December 23, 1982, the claimant and his union representative met with the principal to discuss 1) the circulation of the newsletter, 2) a letter dated December 5, 1982, which the claimant had sent to the school superintendent, asking her to join FABA, and 3) another letter, dated December 4, 1982, which the claimant had sent to the principal, stating that the principal was "the newest and most important member of The FABA Committee." The principal placed an unsatisfactory incident report into the claimant's file. In the report, the principal states that she had never given the claimant any indication that she would like to be a member of his organization.

The principal's incident report states, in part:

Be circumspect in your private ventures so as not to intermingle your position as a teacher at George Washington High School with that venture with potential abuses of private information regarding students, school policies and practices, and School District policy and practices.

(R. c–6, pg. 3)

The principal further states in the incident report that she instructed the claimant at the meeting not to send newsletters, such as the one sent to "Mrs. Goodperson," to parents. The principal further instructed the claimant, once again, not to use the employer's equipment or supplies to publish his views.

The referee found that, at the close of the school year in 1982, the employer informed the claimant that his position as a French teacher would be eliminated because there were too few students enrolled in his class. The referee also found that the claimant was then transferred to another high school, Central High School, which the claimant testified he preferred.

On January 18, 1986, three years after the claimant had been transferred to Central High from George Washington High, the claimant suffered from "anxiety palpitations" and was hospitalized.

The claimant contended that conditions at George Washington High such as the principal's reprimand in 1982, created an abnormal working environment, which resulted in his mental illness three years later.

The claimant presented the testimony of Dr. David Rubinstein, the claimant's treating psychiatrist, who testified that the claimant suffered from an adjustment disorder, with depressive features, which was causally related to incidents at George Washington High. Dr. Rubinstein testified that "the claimant's perceptions were subjective, possibly being based on his own distorted views of reality." Finding of Fact No. 15. The referee found Dr. Rubinstein's testimony credible. The referee also found credible the claimant's testimony that the claimant's perception of the principal's reprimand was that the principal had been "torturing and threatening" him. Finding of Fact No. 9.

The referee found that the claimant's reaction to the reprimand was not the normal or expected reactions of similarly situated teachers. The referee further found that the claimant had not been subjected to any abnormal working conditions at George Washington High, and that the claimant's injury resulted from the claimant's subjective reaction to a single disciplinary reprimand, which the principal had administered in a normal, appropriate way.

The referee denied the claimant's petition, concluding that the claimant's subjective perception of mental stress and

harassment did not establish the existence of abnormal working conditions through objective evidence.

The claimant appealed the referee's decision to the board, which affirmed that decision. The claimant filed the present appeal of the board's decision with this court.

## ANALYSIS

This court's scope of review of decisions made by the board is limited to determining whether constitutional rights were violated, whether errors of law were committed, or whether the relevant findings of fact are supported by substantial evidence. *City of Williamsport v. Workmen's Compensation Appeal Board,* 55 Pa.Commonwealth Ct. 618, 423 A.2d 817 (1980).

### 1. Abnormal Working Conditions

■ The claimant contends that there was an abnormal work environment at George Washington High which led to his mental illness, and that the referee therefore erred in denying his petition for workmen's compensation benefits.

■ In order to be entitled to workmen's compensation benefits, a claimant must prove by *objective* evidence that he suffered a work-related mental illness which was not caused by his subjective reaction to normal working conditions. *Martin v. Ketchum Inc.,* 523 Pa. 509, 568 A.2d 159 (1990). A claimant must demonstrate that 1) actual (not merely perceived or imagined), *extraordinary events,* which can be pinpointed in time, occurred at work and caused the trauma, or 2) abnormal working conditions over a longer period of time, which make work performance unusually stressful for that type of job, caused the psychic injury. *Lilley v. Workmen's Compensation Appeal Board (York International Corp.),* 150 Pa.Commonwealth Ct. 555, 616 A.2d 91 (1992). Initially, the referee must determine whether an internal change in employment conditions created abnormal working conditions, and the question of whether working conditions were abnormal is one of law and fact. *Id.*

In *Lilley,* a claimant suffered mental illness where he had been dissatisfied, and had disagreed with notices of unsatisfactory work performance, which included warnings that, if his work did not improve he would be subjected to further disciplinary action. The referee found the claimant had *subjectively believed the notices unjustified.* This court concluded that the claimant's reaction to the notices had been subjective and that no abnormal working conditions existed where the employer's analysis of the claimant's work had not been inaccurate; even if inaccurate, performance notices with warnings of disciplinary action if no improvement occurred, do not constitute abnormal working conditions. *Id.* at 562, 563, 616 A.2d at 95.

In *Allegheny Ludlum Steel Corp. v. Workmen's Compensation Appeal Board (Fisher),* 91 Pa.Commonwealth Ct. 480, 498 A.2d 3 (1985), this court affirmed a referee's findings that a deceased claimant had suffered from work-related mental illness, concluding that the claimant's working conditions had been actually abnormal and not merely perceived or imagined as abnormal, where the referee found, through *objective evidence* that 1) the claimant's workload had been *unusually high* after he returned from vacation, 2) the claimant had lost a needed assistant, and 3) computerization of the claimant's office had increased his paperwork. We noted that had the claimant only subjectively believed that his workload had increased, his mental illness would not have been compensable.

In this case, the referee found the claimant's medical witness' testimony to be credible as to the fact that the claimant had suffered a work-related mental illness. However, the referee found that the illness resulted from a subjective reaction to normal working conditions.

The claimant contends that abnormal working conditions existed at George Washington High where 1) he had been reprimanded in 1979 for using school supplies to express his personal views in FABA, 2) the principal had filed an unsatisfactory incident report against the claimant in 1982, resulting in part from the claimant's mailing of a FABA letter to the

parents of one of his students, distribution of the letter in the school community, and use of the school's supplies and equipment to publish his views in FABA, and 3) there had been "daily reminders of his vulnerability to forced transfer and eventual termination." (Claimant's brief, p. 11).

Specifically, the claimant argues that the principal, by requiring him to seek administrative approval before he wrote any more letters to parents, treated him differently from other teachers because other teachers were allowed to communicate to their students on routine matters such as illness, homework, lateness, dress and other operational school matters.

The claimant's FABA newsletter addressed to Mrs. Goodperson included the following statement:

> You are fleeing the environment created by your own people. By the very type of action you took here at our school, and after years of excesses of the civil rights movement, teachers and administrators alike have been taught that it is best to bend and let you do what you want and then live with the results. For years both black and white administrators have told me to "leave them alone and let them do nothing if they don't want to learn."

(R. c–3, p. 2)

Statements in the Mrs. Goodperson newsletter obviously expresses the claimant's view on issues of education in black communities or his perception of black family life in general. It is not abnormal for a principal, concerned for the privacy of her students as well as about offense being given to the parents of her students, to want to put an end to additional similar FABA newsletters which the claimant could have sent to other parents in the future.

Regardless of whether the parents of the black student interpreted incorrectly the claimant's statements as racist, the claimant's action clearly did not conform to normal standards for teachers sending letters to their students. The claimant's letter was not a normal letter from a teacher to parents of one of his students on routine matters such as illness, which the school authorizes.

In addition, the principal reprimanded the claimant for using school supplies and equipment to express his views in FABA. The principal's incident report, in light of the claimant's actions, cannot be said to be abnormal under the circumstances in this case.

Also, although the claimant argues that he had been reminded each day of his vulnerability to forced transfer and eventual termination (the claimant does not say by whom), the referee did not make such a finding. The referee found that George Washington High transferred the claimant to a new school, not because of his past actions, but because there were few enrollments in his class, and that the claimant himself provided written proof of that fact. Finding of Fact No. 10. The referee found that the claimant in fact preferred the transfer. An abnormal working condition does not exist where a teacher may be transferred for lack of enrollment in his class.

Dr. Rubinstein, the claimant's physician whose testimony the referee found credible, testified that:

One has to put this also in context with the kind of individual that Mr. Morris is. *He's an extremely sensitive human being, extremely emotionally sensitive* and tends to react to the rejections of something he stood so strongly for and he devoted his life for, which was to teach. (N.T., Dr. Rubinstein, p. 13)

.　　.　　.　　.　　.　　.

Q. And consistent with DSM III and consistent with your diagnosis, his response was in excess of the normal expected reaction?

A. That becomes a little bit simplified, *it was in excess of the expected reaction.* The problem is that most individuals do not have the kind of idealism that Mr. Morris has. Most individuals are not that sensitive and emotional like Mr. Morris. (N.T. p. 45)

(Emphasis added.)

In addition, the claimant's own admission that he *perceived* the principal's reprimand as "torture" is further evidence of his subjective reaction to the situation.

Thus, this court concludes that the referee's findings that, objectively, no abnormal working conditions existed at George Washington High, and that the claimant's mental illness resulted from his subjective reaction to an appropriate reprimand for unsatisfactory actions at work, is supported by substantial evidence.

### 2. *First and Fourteenth Amendment Violations*

█ The claimant asserts that this court should still rule in his favor because claimant's mental illness resulted from a violation of his right of freedom of expression under the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983. The claimant contends that disciplinary action violating federal law constitutes abnormal working conditions.

Apparently the claimant's argument is that if the contents of the newsletter to Mrs. Goodperson constitutes protected speech under the constitution, then the principal's reprimand was unlawful and abnormal under the circumstances.

█ A claimant alleging violations of an individual's right to freedom of speech involves a three-step analysis: 1) whether the individual was engaged in protected activity, i.e. oral or written comments on matters of legitimate public concern by public school teachers constitutes protected speech 2) whether the protected speech played a substantial role in an action taken against the claimant and 3) whether the same action would have resulted in the absence of the protected conduct, in which case the claimant cannot recover. *Trotman v. Board of Trustees of Lincoln University,* 635 F.2d 216 (3d Cir.1981).

The claimant cites *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) which holds that a public school teacher may not be fired for writing and publishing in a local newspaper a letter criticizing the school board's allocation of school funds between educational and

athletic programs and the superintendent's methods of inform-
ing taxpayers on school revenues, where the communication
does not impede the teacher's performance of his daily duties
or interfere with the regular operations of the school.

The claimant contends that his newsletter merely addressed
issues such as bussing, integration, discipline, and other mat-
ters of general public concern. However, this court concludes
that statements in the newsletter are not protected speech as
required by the first prong of the test in *Trotman,* where the
claimant distributed to the parent of a student, to certain
members of the school body and to various organizations,
private information regarding one of the students. Such
information cannot be said to be of public concern.

Thus, this court concludes that the employer did not violate
the claimant's right to freedom of speech.

### 3. Due Process

The claimant argues that his due process rights, which
requires a fair tribunal, were violated where the board's
decision may have been possibly tainted by misrepresentations
made by the employer in its brief.

However, this court notes that the board, in rendering its
decision, reviews the entire record, including the findings of
fact and conclusions of law which the referee makes, affirming
the referee decision where substantial evidence supports that
decision, and does not rely on assertions made by counsel to
either party.

### 4. Oral Representations made by Employer's Attorney

Lastly, the claimant contends that the employer is estopped
from contesting the workmen's compensation claim because
during and after settlement discussion in a federal statutory
action against the employer in which the parties agreed to
settle the case, the employer's attorney orally agreed, that the
employer would not contest a workmen's compensation claim,
although that oral agreement was not made a part of the final
written settlement agreement.

Because the claimant did not raise this issue before the board, the claimant may not raise that issue for the first time on appeal to this court.   Pa.R.A.P. 302(a).

Accordingly, the decision of the board is affirmed.

## ORDER

NOW, August 29, 1994, the decision of the Workmen's Compensation Appeal Board, dated May 10, 1993, at No. A91–2043, is affirmed.