645 A.2d 950

**DEPARTMENT OF PUBLIC WELFARE and Pimco, Petitioners,**

.v.

**WORKMEN'S COMPENSATION APPEAL BOARD (O'HARGAN), Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 12, 1994.

Decided July 12, 1994.

Reargument Denied Sept. 8, 1994.

684

Dennis J. Bonetti, for petitioners.

Karl R. Hildabrand, for respondent.

Before KELLEY and NEWMAN, JJ., and KELTON, Senior Judge.

NEWMAN, Judge.

The Department of Public Welfare (DPW) and PIMCO, its insurer, appeal from an order of the Workmen's Compensation Appeal Board (Board) which affirmed a referee's decision granting benefits to Charles J. O'Hargan (Claimant) pursuant to The Pennsylvania Workers' Compensation Act (Act).[1] We reverse.

1. Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §§ 1–1031.

## FACTS

Claimant was employed by the Commonwealth from 1963 through 1984. In 1968, Claimant was transferred to the Warren' State Hospital (Warren)[2] where he was first employed as a social worker. Claimant received several promotions over the years; and in 1978, he was named Director of Social and Rehabilitative Services. As the Director, Claimant was in charge of a staff of approximately fifteen case workers and coordinated the Medical Assistance Program for Patient Services.

In June of 1981, Claimant was named Acting Superintendent of Warren. Claimant was later appointed Superintendent in March of 1982, effective retroactively to December, 1981. Claimant and his family lived on the grounds of the hospital; and Claimant was "on call" twenty-four hours a day.

Claimant inherited problems of poor communication with DPW's office in Harrisburg, and there were pressures to reduce the patient population and the number of buildings at Warren. From the time of his appointment, Claimant was concerned about the pressures associated with the position and the fact that he did not have civil service protection. As the superintendent of the hospital, Claimant was no longer a civil servant but rather served at the pleasure of the Secretary of DPW. Claimant was also bothered by the fact that he was the first non-medical superintendent at Warren.

Although Claimant was responsible for operations at Warren, he was not without supervision from DPW. Claimant's supervisor, Dale Newhart (Newhart), and his staff were located in Harrisburg; however, they visited the hospital frequently.

Periodically, Warren underwent accreditation and Medicare reviews. Because approximately $7 million in federal funding depended on annual passage of Medicare certification, Claim-

---

2. Warren is a state mental institution which serves thirteen counties, covering approximately twenty-five percent of the state. In 1981, the patient population was approximately 1,000, and the staff was equal in number.

ant worked fourteen to fifteen hours a day for six to seven days per week during the months preceding the 1982 Medicare review.

In 1983, there was a joint commission review; and the pressures of the review process culminated for Claimant during August of that year. Claimant became extremely depressed and discussed his problems with Newhart. Thereafter, Newhart arranged for two psychiatrists to visit Claimant at Warren; and pursuant to their recommendation, Claimant voluntarily admitted himself to Lankenau Hospital for treatment of depression.[3] Forty-one days after admission, Claimant was discharged with a good prognosis.

Following his discharge, Claimant resumed his duties as superintendent. However, Claimant was concerned that he was labeled a "sick person." For instance, when Jamie Cushey, R.N., joined the hospital staff to assist him, Claimant believed that Nurse Cushey was hired to investigate him. At Claimant's request, Nurse Cushey left the facility in April of 1984.

In June of 1984, the hospital passed the Medicare review with good results. However, during July and the beginning of August 1984, Claimant was involved in a number of incidents that caused great concern to Warren's executive staff. Many of these events were verified by Claimant's wife and daughter, and none was refuted by Claimant. Specifically, Claimant's wife testified that "instead of easing up, it just seemed that [Claimant's] mind and body just kept speeding up." Notes of Testimony of April 20, 1988 at 158. Claimant also testified that he felt that constant pressure was being placed on him by his superiors, and staff members told him that he was "trying to do too much" and that he "should slow down." Notes of Testimony of October 14, 1987 at 53–54. Claimant further testified that his eating and sleeping habits were poor. *Id.*

The staff reported to Newhart that Claimant's behavior was becoming increasingly aggressive and threatening. As such, on August 3, 1984, Newhart sent a psychiatrist, John F.

---

**3.** Prior to 1983, Claimant had not undergone any psychiatric treatment.

Mitchell, M.D., to observe Claimant at work and to report on Claimant's emotional state.

Although Claimant was initially told that Dr. Mitchell was coming to evaluate the staff, Claimant was told the true nature of the doctor's visit upon his arrival. Claimant was greatly disturbed that Dr. Mitchell came to evaluate him. After Claimant met with Dr. Mitchell, Claimant asked Dr. Mitchell to state a conclusion regarding his mental condition. Dr. Mitchell told Claimant that he was not prepared to do so at that time, and Claimant called him "a little twerp." N.T. of 4/20/88 at 166.

After Dr. Mitchell's visit, Claimant's condition rapidly deteriorated. Claimant had hallucinations, experienced difficulty sleeping and, at times, was irrational, delusional[4] and hyperactive. Claimant offered to resign from his position at Warren, but Newhart told him not to make any hasty decisions.

Thereafter, Claimant told Newhart that he would voluntarily seek treatment, and Claimant arranged for admission to the Cleveland Clinic for a sleep disorder. However, in the interim, Claimant's erratic behavior prompted five members of Warren's executive staff to petition for the involuntary emergency examination and treatment of Claimant pursuant to Section 301 of the Mental Health Procedures Act, Act of July 9, 1976, P.L. 817, *as amended*, 50 P.S. § 7301.[5]

While Claimant and his family were preparing to leave for vacation and the Cleveland Clinic on August 7, 1984, two

---

4. For example, Claimant had delusional thoughts when comparing the words, "D–A–D" and "G–O–D." His wife testified that Claimant pounded the table and said that dad and God were the same thing. N.T. of 4/20/88 at 174.

5. Pursuant to Section 301(a) of the Mental Health Procedures Act, [w]henever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that *he poses a clear and present danger of harm to others or to himself.*

50 P.S. § 7301(a) (emphasis added).

members of the Warren County Sheriff's office came to Claimant's home with the involuntary commitment papers. Members of the executive staff were also present and discussed the commitment with Claimant for two hours. The executive staff was concerned about the safety of Claimant and his family, and they did not feel that Claimant should be driving in his condition.

Claimant was then taken to the Western Psychiatric Institute and Clinic (Western), in Pittsburgh. Before committing Claimant, a doctor at Western evaluated Claimant and concluded that he posed a clear and present danger, which resulted in an initial admission of 120 hours. *See* 50 P.S. § 7302(d). Thereafter, the physicians at Western filed a petition for extension of involuntary treatment, which was granted by the Court of Common Pleas of Allegheny County. *See* 50 P.S. § 7303(a).

Twenty-one days after his admission, Claimant was discharged from Western. Newhart, however, determined that Claimant should not return to his position as superintendent of Warren. Thus, Claimant was offered a new position at Woodville State Hospital as Assistant Director of Social and Rehabilitative Services. Claimant did not accept this position but tendered his resignation as superintendent of Warren and elected an early retirement.

Thereafter, Claimant lived in Puerto Rico and later moved to Florida where he has resided since April 1986. In April of 1988, Claimant accepted a position as a case worker at the Charlotte County Mental Health Clinic. However, after one day, Claimant was unable to handle the stress associated with the position, and he did not return. Claimant has not been gainfully employed since August 6, 1984.

## PROCEDURAL HISTORY

On July 9, 1987, Claimant filed a claim petition, alleging "[d]isability resulting from severe job-related depression; Diagnosis—Bipolar Manic Depression due to stress of employment." DPW filed an answer, denying the allegations.

Hearings were held before a referee, and considerable testimony was presented. In support of his petition, Claimant, his wife and his daughter testified. Claimant also presented the deposition testimony of Ruben J. Echemendia, Ph.D. and John E. Allen, M.D. In opposition to Claimant's petition, DPW presented the testimony of Dale Newhart, several members of the Warren staff, the Sheriff and Gene L. Cary, M.D. While all of the medical experts agreed that Claimant suffered from a bipolar disorder that exhibits both manic and depressive states, the experts did not agree regarding the causal relationship between Claimant's employment and his subsequent psychiatric injury.

Based upon the evidence presented, the referee found that Claimant was disabled and unable to return to his pre-injury job. The referee further found that while there was nothing unusual about Claimant's early job duties and the pressures associated with them, the scrutiny to which Claimant was subjected following his voluntary commitment to Lankenau was highly unusual. In this regard, the referee believed that Claimant would not have been so scrutinized had he returned from treatment for a heart attack or diabetes.

The referee also found convincing testimony that Claimant's condition was precipitated by Dr. Mitchell's visit and was further exacerbated by the involuntary commitment.[6] The referee further found that a superior's visit for the specific purpose of psychologically evaluating an employee and an involuntary commitment proceeding were abnormal working conditions.

As such, the referee concluded that Claimant met his burden of establishing that his psychiatric injury was caused by objective abnormal working conditions as opposed to Claimant's subjective reaction to normal working conditions. The referee further concluded that DPW did not establish that there was work available to Claimant within his work capabilities, and Claimant affirmatively established that he was unable

6. The referee specifically noted that he found Claimant's witnesses to be more persuasive and that he gave more credence to Dr. Echemendia's opinion.

to return to his pre-injury job, the job offered to him or any job in Pennsylvania. Finally, the referee concluded that the notice provision of the Act was met as DPW knew or should have known of Dr. Mitchell's visit and of the involuntary commitment.

Accordingly, the referee granted Claimant's claim petition and awarded him benefits from August 7, 1984, continuing indefinitely. DPW appealed to the Board, which affirmed the decision of the referee. This appeal followed.

## ISSUES

On appeal to this court, DPW raises the following issues: (1) whether the present claim is barred by the three-year statute of limitations set forth in Section 315 of the Act, 77 P.S. § 602; (2) whether Claimant sustained his burden of proving that his mental condition was caused by abnormal working conditions; (3) whether the medical evidence presented by Claimant was legally competent to support an award of compensation; and (4) whether Claimant's benefits should have been suspended since he voluntarily retired from employment when suitable work was available.[7]

## DISCUSSION

### 1. Statute of Limitations

■ With respect to the first issue, Section 315 of the Act provides, in pertinent part, as follows:

In cases of personal injury all claims for compensation shall be forever barred, unless, within three years after the injury, the parties shall have agreed upon the compensation payable under this article; or unless within three years

7. Our scope of review is limited to determining whether constitutional rights were violated, an error of law was committed, or whether necessary findings of facts are supported by substantial evidence. *Bethenergy Mines, Inc. v. Workmen's Compensation Appeal Board (Skirpan)*, 132 Pa.Commonwealth Ct. 277, 572 A.2d 838 (1990), *aff'd*, 531 Pa. 287, 612 A.2d 434 (1992).

after the injury, one of the parties shall have filed a petition as provided in article four hereof.

77 P.S. § 602.

In this regard, DPW asserts that the depressive phase of Claimant's bipolar disorder manifested itself on September 1, 1983, the date that Claimant voluntarily admitted himself to Lankenau Hospital for depression. Therefore, it is DPW's position that the date of Claimant's injury for purposes of Section 315 was September 1, 1983. DPW further asserts that because the present claim petition was not filed until July 9, 1987, the petition is barred by the three-year statute of limitations. We disagree.

DPW is correct that for purposes of the three-year statute of limitations in Section 315, the date of injury controls. *Berisford v. Workmen's Compensation Appeal Board (Jessop Steel Co.)*, 142 Pa.Commonwealth Ct. 83, 596 A.2d 1237 (1991). However, as Claimant correctly notes, he suffered from a bipolar disorder which exhibits both depressive and manic states. The hospitalization of Claimant in September 1983 merely represented the depressive stage of his illness. According to the testimony of Dr. Echemendia, which the referee accepted as credible, the full blown manic phase of Claimant's disorder did not manifest itself until August 3, 1984. Dr. Echemendia's Deposition at 55. Therefore, for statute of limitations purposes, we conclude that the date of Claimant's injury was August 3, 1984. Accordingly, we further conclude that Claimant's petition, which was filed on July 9, 1987, is not time barred.

### 2. *Abnormal Working Conditions*

With respect to the second issue, our supreme court has held that when there is no physical injury as a precursor to a psychiatric injury, the claimant must establish that the mental disability suffered is not the result of the claimant's subjective reaction to normal working conditions. *Martin v. Ketchum, Inc.*, 523 Pa. 509, 568 A.2d 159 (1990). In this regard, the claimant's burden is twofold: (1) he must prove by objective evidence that he has suffered a psychiatric injury,

and (2) he must prove that such injury is the result of abnormal working conditions. *Id.*

Regarding the first prong, Claimant presented objective evidence of psychiatric injury which was accepted by the referee. To be compensable, however, we must still determine whether the events which caused Claimant's injury constitute abnormal working conditions.

Whether specific working conditions are abnormal is a mixed question of law and fact which is fully reviewable by this court. *Przychodzki v. Workmen's Compensation Appeal Board (Wyeth Laboratories),* 159 Pa.Commonwealth Ct. 202, 632 A.2d 1048 (1993). Moreover, when determining whether particular employment events constitute abnormal working conditions, the events must be considered in relation to the specific employment involved. *Antus v. Workmen's Compensation Appeal Board (Saw Mill Tubular Div., Cyclops Indus.),* 155 Pa.Commonwealth Ct. 576, 625 A.2d 760 (1993), *aff'd,* 536 Pa. 267, 639 A.2d 20 (1994).

In the instant case, the referee specifically found that Dr. Mitchell's visit for the express purpose of psychologically evaluating Claimant and the executive staff's subsequent decision to petition for Claimant's involuntary commitment were abnormal working conditions. It is DPW's position, however, that although the measures taken by Newhart and the executive staff were admittedly extraordinary, these measures were prompted by Claimant's strange and erratic behavior. We agree.

We have reviewed the entire record in this case and have found nothing to suggest that Newhart and the executive staff were motivated by anything other than their genuine concern for Claimant and the safety of the patients at Warren. The record reveals that when Claimant offered to resign following Dr. Mitchell's visit, Newhart attempted to comfort him and advised him not to make any rash decisions. We also note that when Claimant again informed Newhart in November of 1984 that he was going to resign, Newhart urged him to

consider the matter carefully. On direct examination, Newhart was questioned as follows:

Q. Why did you tell him not to resign? Why didn't you say, 'I'm glad to get you out of here. Goodbye'? Why did you want to keep him on?

A. I guess it must be that we saw redeeming value and that we, again, were trying to do the very best for him that we could under the circumstances.

Notes of Testimony of June 29, 1988 at 89.

The record also reveals that during the weeks preceding his decision to send Dr. Mitchell to Warren, Newhart received numerous reports from the staff regarding Claimant's deteriorating mental condition. These incidents included Claimant's actions in keeping guns at his residence on the hospital grounds and threatening to "shoot first and ask questions later"; roaming around the hospital in the middle of the night; transferring patients during the early morning hours without physician authorization; and threatening to "lock patients up and throw away the key" when he found them smoking on the hospital's front porch. Deposition of Claire Morrison at 9–12, 15–16; Deposition of Roberta Huckabone at 9–10. Under these circumstances, we conclude that DPW would have been remiss had it not taken action.

Moreover, we note that Warren is a state mental hospital which serves thirteen counties, covering approximately twenty-five percent of the Commonwealth. As the superintendent of Warren, Claimant was responsible for a staff of approximately 1,000 and a patient population equal in number. Given the importance and magnitude of Claimant's duties and the demands of his position, we conclude that DPW acted properly in sending a trained professional to evaluate Claimant to determine his continuing fitness.

We further note that this court has previously held that under certain circumstances, heightened scrutiny of an employee's work performance may be warranted and does not constitute an abnormal working condition. *See Calabris v. Workmen's Compensation Appeal Board (American General*

*Companies)*, 141 Pa.Commonwealth Ct. 405, 595 A.2d 765 (1991) (greater scrutiny of a branch manager's performance during an audit, which was precipitated by the manager's dismissal of a subordinate for misappropriation of funds, did not constitute an abnormal working condition). *See also Bugay v. Workmen's Compensation Appeal Board (Mellon Bank, N.A.)*, 156 Pa.Commonwealth Ct. 565, 628 A.2d 519 (1993) (the questioning of a bank teller, as part of an investigation into the deposit of a questionably endorsed check, did not constitute an abnormal working condition). As such, we conclude that under the circumstances of this case, DPW's evaluation of Claimant was proper and did not constitute an abnormal working condition.

█  In addition, the executive staff's decision to petition for Claimant's involuntary commitment was similarly prompted by Claimant's unusual behavior and the staff's concern for his safety and that of the patients. The record reveals that on the day that Claimant was involuntarily committed, members of the executive staff met with Claimant for two hours in an attempt to convince him to voluntarily commit himself. Claimant, however, refused.

Moreover, we note that although Claimant had agreed to admission to the Cleveland Clinic, he was seeking treatment for a sleep disorder, not his manic-depressive state. When Newhart was asked why he and the executive staff chose Western, he testified that the reasons were two-fold:

> One is that [Western] is certainly, if not the top, one of the top drawer psychiatric treatment facilities in the state. Secondly, again considering [Claimant's] position at the hospital and in the community, it would not have been well for him to be psychiatrically hospitalized in the near community, so that going to [Western] served both of those purposes.

N.T. of 6/29/88 at 78.

Because the executive staff's decision to petition for Claimant's involuntary commitment was precipitated by his erratic behavior and their genuine concern for his well-being, we

conclude that under the unique facts of this case, the commitment proceeding was not an abnormal working condition. Accordingly, we hold that Claimant failed to sustain his burden of proving that his psychiatric injury was the result of abnormal working conditions,[8] and the order of the Board is reversed.

## ORDER

AND NOW, July 12, 1994, the order of the Workmen's Compensation Appeal Board in the above-captioned matter is reversed.

---

8. Our resolution of this issue makes unnecessary our consideration of DPW's remaining issues.