Kim **HEATH**, Petitioner,

v.

**WORKERS' COMPENSATION APPEAL BOARD (PENNSYLVANIA BOARD OF PROBATION AND PAROLE), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted Jan. 7, 2005.
Decided Feb. 9, 2005.

Eugene Mattioni, Philadelphia, for petitioner,

Audrey J. Copeland, Newtown Square, for respondent.

BEFORE: PELLEGRINI, Judge, COHN JUBELIRER, Judge, and FLAHERTY, Senior Judge.

OPINION BY Senior Judge FLAHERTY.

Kim Heath (Claimant) petitions for review of a decision of the Workers' Compensation Appeal Board (Board) which reversed the decision of the Workers' Compensation Judge (WCJ) granting Claimant benefits for a psychological injury that she alleged arose from abnormal working conditions. We affirm the Board.

Claimant was employed by the Pennsylvania Board of Probation and Parole (Employer) as a parole agent at Graterford Prison (Graterford). Claimant's immediate supervisor at Graterford was Calvin Ogletree, Jr. (Ogletree), whose immediate supervisor was James Newton (Newton). Claimant testified that the following occurred: In October of 1997, Newton asked Claimant to join him at a casting call for an Oprah Winfrey movie, thus beginning a course of conduct whereby Newton subjected Claimant to attention she did not seek and sought to discourage. Claimant declined Newton's invitation, but within the week he invited Claimant to a concert at which Newton's brother would be performing. Again, Claimant declined. Shortly thereafter Newton telephoned Claimant to invite her to another show; Claimant again declined. Newton then proceeded to discuss his personal issues and problems, at which point Claimant ended the call. In January of 1998, Claimant found an envelope on her desk with a ticket for another show of Newton's brother. Claimant spoke to Newton's brother, who also worked at Graterford, and he explained that Newton asked him to give her the ticket. Claimant did not attend the show.

Newton's conduct did not abate. Once, also in January of 1998, a love song came on the radio at work, prompting Newton to move up close to Claimant and express his opinion that it was a "sexy, sweet" song. Reproduced Record 27a. Newton also developed such habits as standing behind Claimant at her desk and making sucking sounds and sitting near Claimant's desk and staring at her. When Claimant asked if there was something he wanted, Newton would start a personal conversation. Claimant would then advise him that she was busy with work in an effort to end the conversation. On one occasion, Newton asked Claimant for her home address and telephone number. (R.R. at 29a). Claimant responded that her supervisor, Ogletree, had this information if it were ever needed.

Following Claimant's continued rebuffs of these overtures, Newton began to burden Claimant with additional work assignments, which required her to put aside her normal caseloads and to fall behind. When informed, Ogletree expressed surprise to learn that Newton was giving assignments to Claimant without his knowledge and stated that he would talk to Newton about it. (R.R. at 29a–30a).

On February 10, 1998, Newton asked Claimant to attend a meeting in his office, which was not located at the prison, on Friday, February 13, 1998. He refused to respond to Claimant's inquiry about the meeting's purpose; Claimant objected and stated that she might bring union representation to the meeting. Newton responded by telling her that union repre-

sentation was not necessary. When Claimant persisted with her inquiry, Newton became irate. (R.R. at 30a–31a). Claimant complained to Ogletree, who agreed to speak to Newton.

On Thursday, February 12, 1998, near the end of the day, Newton gave Claimant a memo ordering her to attend the meeting at his office the following day and that union representation would not be permitted. Newton did not advise Ogletree of the meeting, but Claimant did. On February 13, 1998, Claimant went to the meeting accompanied by Ogletree and her union president, who was not allowed into Newton's office. At the meeting, Newton told Claimant that he wanted the meeting so he could tell her that she was doing a great job. When Claimant brought up the subject of Newton's harassment of her, Newton refused to respond and abruptly ended the meeting. (R.R. at 33a–36a).

On or about February 18, 1998, Claimant filed a grievance with her union regarding Newton's harassment. Within a week, Newton tried to lure Claimant into Ogletree's empty office on the stated pretext that she needed a second photo identification card; there was no such need. (R.R. at 39a–40a). That day, Claimant spoke to the Employer's Affirmative Action Officer, LaDelle Ingram (Ingram), and shortly thereafter, on March 4, 1998, Claimant presented Ingram with a written complaint of sexual harassment against Newton. Ingram informed Newton that he was not to have any contact with Claimant. Despite this warning, Newton called Claimant's direct line at work on at least two separate occasions. (R.R. at 49a).

Soon after presenting her sexual harassment complaint, Claimant testified that she received a written warning from an inmate that her life was in danger. Claimant attempted to admit this note into evidence, but the Employer registered a hearsay objection. The WCJ requested some foundation testimony before ruling on the objection, and Claimant testified that the note came through interagency mail, which inmates can use to send mail to parole officers. Claimant stated that after receiving the warning she asked the inmate how another inmate could hurt her, and the inmate responded that it was the corrections officers that were out to get her. The WCJ sustained Employer's hearsay objection and noted that "at this point I don't have enough to have this go to the employee's conduct. You may have to take the testimony of the inmate at this point to get that in." (R.R. at 48a). Claimant's attorney stated that he was going to attempt to obtain more evidence. However, Claimant did not present any further evidence in this regard. Some time later, Claimant sought a job transfer to a different location, and on April 1, 1998, Claimant was told to report to a Philadelphia District Office. She did, but for the next month, she lacked a desk and had almost no work. Further, she was not issued a weapon, as required by Employer's policy. (R.R. at 54a–55a).

Claimant began experiencing anxiety, which was manifested in chest pains, heart palpitations and anxiety attacks. Claimant contacted a State Employee Assistance Program and was referred to a psychologist, Suzanne Baxter, M.A. (Baxter) for treatment. Baxter saw Claimant the next day and testified that she put her out of work due to acute stress disorder, caused by a feeling of lack of support from her employer and failure to protect her from Newton's unwanted advances. Within a week, Claimant also saw Richard Watson, D.O. (Dr. Watson), an employer approved "panel" physician. Dr. Watson agreed with Baxter's diagnosis of acute stress disorder and her direction that Claimant not

return to work due to an undue amount of stress. (R.R. at 138a–139a).

Employer refused Claimant workers' compensation benefits for the stated reason that Claimant did not suffer a work-related injury and did not give notice of her alleged injury to employer within one hundred and twenty days.[1] On or about June 24, 1998, Claimant filed a claim petition alleging that as of May 1, 1998, she sustained a disabling psychological injury in the form of stress anxiety while in the course of her employment as a parole agent, which resulted from the sexual harassment by Newton and the retaliatory acts of her employer. On August 10, 1998, Employer filed an answer denying the allegations contained in the claim petition.

On November 6, 1998, Employer offered Claimant a position at a new facility in Chester as one of two institutional parole agents. On December 11, 1998, Employer sent Claimant a release to sign as a condition to being allowed to return to work. This release required Claimant to give up all claims against Employer, including her pending workers' compensation claim and sexual harassment claims. Claimant refused to sign the release. (R.R. at 410a–413a).

By letter dated January 4, 1999, Employer informed Claimant that she had to return to work by January 11, 1999 or risk termination. Claimant returned to work as instructed and reported to her assigned supervisor, Bonnie Ferguson (Ferguson) who informed Claimant she had no knowledge that Claimant would be reporting for work. Claimant testified that she was given very few work assignments. After reviewing Claimant's activity sheets, which indicated that she had no work, Ferguson instructed Claimant not to make such en-

tries because they would jeopardize her ability to receive her paycheck. (R.R. at 892a). Another parole agent, Stanley Webb (Webb), verbally assaulted Claimant, screaming at her that if she did not like her job, then she needed to leave. (R.R. at 878a).

By February 5, 1999 Claimant's anxiety again forced her to leave her new position with Employer. On February 8, 1999, Claimant's treating psychologist, Baxter, wrote to Claimant's supervisor and informed her that Claimant was unable to continue work due to her medical condition. By letter dated March 3, 1999, Employer directed Claimant to: (1) return to work by March 15, 1999; (2) apply for disability retirement; or (3) resign from her employment. Claimant, through counsel, sent Employer a response on March 11, 1999 stating that due to her on-going medical condition and her unwillingness to retire or resign from her employment, she would not be returning to work on March 15, 1999. On April 16, 1999, Claimant's employment was terminated.

In a series of hearings before the WCJ on her 1998 claim petition, Claimant testified on her own behalf and submitted the deposition transcripts of Baxter and Dr. Watson. Claimant also submitted the testimony of three factual witnesses who were her co-workers: Rennin McCrey, Gloria Hamilton and Ogletree. With regard to the testimony of these witnesses, the WCJ found, in relevant part, that:

4. Ms. McCrae testified, in pertinent part, as follows:

a. . . . . She was present on February 12, 1998, when Mr. James Newton provided an envelope to the Claimant. She stated that she and the Claimant were

---

1. Section 311 of the Workers' Compensation Act (Act), Act of June 2, 1915 P.L. 736, *as amended,* 77 P.S. § 631, requires that an em-

ployee give notice to an employer within 120 days of a work-related injury.

walking to leave for the day when Mr. Newton came out and gave the Claimant a sealed envelope, even though he had been at the facility all day. Ms. McCrae stated that once the Claimant read the contents of the envelope, she became angry. She stated that the Claimant then showed her the contents of the envelope when she inquired about it.

b. Ms. McCrae stated that she had observed Mr. Newton around the Claimant while she was working at Graterford. The Claimant's cubicle was about 10 feet away and was visible from where she sat. She stated that Mr. Newton would talk to the Claimant anytime he was at the facility, whether three days a week or every day. Ms. McCrae recalled a time when Mr. Newton and another agent were talking in the Claimant's cubicle and the Claimant asked them to leave because she wasn't able to get her work done ... She does not recall Mr. Newton having been involved in any disagreements or arguments with any of the other employees at Graterford.

c. Ms. McCrae stated that Mr. Newton never invited her to go hear his brother's singing group.

d. Ms. McCrae stated that Mr. Newton and Mr. Ogletree gave work assignments to her to complete.

5. Ms. Hamilton testified, in pertinent part, as follows:

a. ... She witnessed an incident between the Claimant and Mr. Newton concerning a photo ID, wherein Mr. Newton attempted to get the Claimant to go into an area behind the main office, specifically the office of Mr. Ogletree. Mr. Ogletree was not present in his office or the facility at that time. Ms. Hamilton stated the Claimant seemed agitated and did not want to go into that area. After motioning by Mr. Newton to move into the office, the Claimant still did not go. Ms. Hamilton admitted writing a statement at the Claimant's request shortly after the incident occurred on March 4, 1998.

b. Ms. Hamilton remembered observing Mr. Newton and the Claimant on other occasions, but did not notice anything unusual, except a little tension between the two.

c. Ms. Hamilton was never invited by Mr. Newton to hear his brother's singing group. Nor did Mr. Newton ever say anything "out of the way" to her.

d. Ms. Hamilton stated she had seen Mr. Newton looking at the Claimant, but she did not see him looking at her or any other female in the work area.

6. Mr. Ogletree testified, in pertinent part, as follows:

a. ... He stated that he had seen the Claimant and Mr. Newton interact when at the Graterford facility.

b. Mr. Ogletree was present at a meeting on Friday, February 13, 1998, with Mr. Newton and the Claimant in the State Office Building. He stated that Mr. Newton asked him to be present at the meeting as he had received complaints about the Claimant. Mr. Ogletree wanted to follow the chain of command of the agency, which would mean that the complaints would be given to him by Mr. Newton for him to deal with first. He stated Mr. Newton never sent any complaints to him, and insisted upon the meeting with Claimant. He further stated that Mr. Newton told him if he had a problem with it, he didn't need to come to the meeting.

c. Mr. Ogletree stated the Claimant called him on the day she was given notice of the meeting by Mr. Newton and she was very upset. He asked the Claimant to bring down the notice to his office for them to discuss. He tried to calm the Claimant down. The next day,

he reported for the meeting and he was present, but Mr. Newton would not permit him to participate. Mr. Ogletree stated Mr. Newton commended the Claimant on her job performance and asked if she was having any problems with anybody on her job. The Claimant told Mr. Newton he was the only person she was having problems with. Mr. Ogletree attempted to straighten out some of the problems, but was told the meeting was over.

d. Mr. Ogletree stated he observed Mr. Newton interacting with the Claimant on several occasions and sitting in her cubicle. He also stated Mr. Newton directly gave the Claimant work assignments, which was not in accordance with the processes of the parole unit, especially in the institution. He had spoken to Mr. Newton on several occasions about maintaining the chain of command.

e. Mr. Ogletree stated the Claimant complained to him that she was not able to do the work he assigned because she had to complete the work assigned to her by Mr. Newton at his insistence. In order for the Claimant to get the work done he assigned to her, Mr. Ogletree completed the assignment given to the Claimant by Mr. Newton.

f. Mr. Ogletree stated he never observed any interaction from Mr. Newton to the Claimant that was less than a professional business working relationship. He did state that Mr. Newton regularly violated agency policy by usurping his authority and his job. He received many complaints from his staff that they were being unnecessarily harassed by Mr. Newton, particularly the women.

g. Mr. Ogletree stated that the Claimant complained to him at one time that Mr. Newton was pressuring her to go to some function with him where his brother was singing. The Claimant also complained that Mr. Newton left a ticket for her and called her to say he couldn't make it and they would go next time.

h. Mr. Ogletree stated Mr. Newton acted unprofessionally in many ways in addition to violating the chain of command. He opined that Mr. Newton was not prepared to be a manager from the beginning.

(WCJ's Decision, pp. 8–11; citations to the transcript omitted). Employer, in response, presented the testimony of Newton, Ferguson and Webb; it also submitted the deposition of Jon Bjornson, M.D. (Dr. Bjornson), a psychiatrist.

On March 6, 2001, the WCJ found that Claimant had sustained a work-related injury as a result of abnormal working conditions. On February 25, 2002, the Board reversed. It reasoned that:

Claimant provided no corroborative testimony that these occurrences were actual incidents of harassment. She presented no witnesses to testify that they witnessed the incidents and that they too believed Claimant was being harassed by Mr. Newton. Although she did present the testimony from Mr. Ogletree, the Judge found that Mr. Ogletree stated that he never observed any interaction between Mr. Newton and the Claimant that was less than professional, although Mr. Ogletree did indicate that Claimant was given assignments from Mr. Newton which was not in accordance with the processes of the parole unit ... Claimant also presented testimony of Ms. McCrae and Ms. Hamilton, but again, both only witnessed Mr. Newton talking to Claimant and Ms. Hamilton "did not notice anything unusual" ...

(Board's Decision at 9). With regard to the other conditions that Claimant alleges

contributed to her mental injury, the Board stated that the WCJ "also concluded that because Claimant was placed into a different job after she requested a transfer where she was given few assignments and no desk or office, this was also an abnormal working condition. As we believe this happens in the work place on occasion, this too was not an abnormal working condition." Board's Decision at 10. Claimant appealed seeking reversal of this order. By decision dated November 25, 2002, we affirmed the decision of the Board denying Claimant benefits, although we affirmed the Board on different grounds. Specifically, we concluded that when a co-employee, or third party, sexually harasses an employee, any resulting mental injury is not compensable under the Act because Section 301(c)(1), which is commonly known as the "personal animus" exception, operates to remove any claim for that injury from the purview of the Workers' Compensation Act.

Claimant appealed our decision to the Supreme Court. In a decision dated October 20, 2004, the Supreme Court vacated our decision and remanded this case to us. Specifically, the Supreme Court stated that:

> ... As the "personal animus" exception is not jurisdictional, it is not an issue for a court to raise *sua sponte* ... Rather ... the party defending against the claim for workers. compensation is to raise the exception ... In this case, however, that party, *i.e.*, Employer, did not do so. In *Rox Coal Co. v. Workers' Compensation Appeal Board (Snizaski)*, 570 Pa. 60, 807 A.2d 906 (2002), we held that waiver principles will be applied in a workers' compensation setting and

ruled that another statutory exception to the definition of compensable injury in Section 301(c) was waived by a party's failure to raise it. Thus, Employer's failure to raise the "personal animus" exception means that the issue was waived. *Id.* at 911–14. It necessarily follows that the exception should have played no part in the Commonwealth Court's review in the present case.

For these reasons, we vacate the Commonwealth's Court's order and remand this case for the court to reconsider the merits of Claimant's appeal from the Board's decision. The court is to reconsider whether Claimant proved her claim with regard to Newton's actions. Likewise, insofar as the Commonwealth Court's application of the "personal animus" exception may have affected its review of the Claimant's claim that she was entitled to compensation under the Act for certain actions that were taken by Employer after she reported Newton's conduct, the Court's is to reconsider that claim.

*Heath v. Workers' Compensation Appeal Board, (Pennsylvania Bd. of Probation and Parole)*, —— Pa. ——, 860 A.2d 25 (No. 30 EAP 2003, filed October 20, 2004), slip op. at 7–8.

■ Therefore, in accordance with the Supreme Court's order, we will proceed to address the merits of Claimant's appeal from the Board's decision.[2]

On appeal, Claimant argues that the Board erred as a matter of law by: 1) concluding that she was not exposed to abnormal working conditions and specifically failing to recognize that sexual harassment by a supervisor constitutes an abnormal working condition, 2) concluding

---

**2.** Our scope of appellate review is limited in workers' compensation proceedings to a determination of whether constitutional rights have been violated, an error of law has been committed, or any findings of fact are not supported by substantial evidence. *Volterano v. Workmen's Compensation Appeal Board*, 536 Pa. 335, 639 A.2d 453 (1994).

that she failed to produce corroborating evidence of her sexual harassment, and 3) concluding that the other conditions to which she was exposed were not abnormal and specifically failing to consider the death threat as an abnormal working condition.

■ To recover workers' compensation benefits for a psychic injury, a claimant has the burden of proving by objective evidence that he or she has suffered a psychic injury and that such injury is other than a subjective reaction to normal working conditions. *Martin v. Ketchum, Inc.,* 523 Pa. 509, 568 A.2d 159 (1990). To meet this burden, the claimant must demonstrate either (1) that actual extraordinary events occurred at work, which can be pinpointed in time, causing the trauma experienced by him or her, or (2) that abnormal conditions over a longer period of time caused the mental injury. *U.S. Airways v. Workers' Compensation Appeal Board (Long),* 756 A.2d 96, 101 (Pa.Cmwlth.2000). "Objective evidence which is corroborative of an employee's perception is necessary in determining the existence of abnormal working conditions. An employee's testimony alone on this issue is not sufficient." *Volterano v. Workmen's Compensation Appeal Board,* 536 Pa. 335, 346, 639 A.2d 453, 458 (1994). However, corroborative evidence is not required when an employee is describing actual events that have occurred and the workers' compensation judge finds that such events did occur. *Donovan v. Workers' Compensation Appeal Board (Academy Medical Realty),* 739 A.2d 1156, 1163 (Pa.Cmwlth.1999). In addition, "psychic injury cases are highly fact-sensitive and for actual work conditions to be considered abnormal, they must be considered in the context of the specific employment." *Wilson v. Workmen's Compensation Appeal Board (Aluminum Co. of America),* 542 Pa. 614, 624, 669 A.2d

338, 343 (1996). Whether the findings of fact support a conclusion that the claimant has been exposed to abnormal working conditions is a question of law that is fully reviewable on appeal. *Id.*

■ First, we must address Claimant's arguments that the Board erred in concluding that she was not exposed to abnormal working conditions and specifically failing to recognize that sexual harassment by a supervisor constitutes an abnormal working condition and that the Board erred in concluding that she failed to produce corroborating evidence of her sexual harassment.

As we noted above, a Claimant must provide objective evidence which is corroborative of her perception of the events that occurred in order to prove the existence of abnormal working conditions. The claimant's testimony alone is not sufficient. *Volterano.* On pages six through nine of our opinion above, we set forth the WCJ's findings of fact regarding the testimony of the witnesses Claimant provided in order to corroborate her version of events. Upon review of that testimony, we agree with the Board that this testimony is not sufficient to corroborate Claimant's contention that she was sexually harassed by Newton. As such, Claimant has failed to prove that she was exposed to abnormal working conditions in the form of sexual harassment.

■ Next, Claimant argues that the Board erred in concluding that the other conditions to which she was exposed were not abnormal · and specifically that the Board erred by failing to consider the death threat as an abnormal working condition. With regard to the warning that Claimant stated she received from an inmate which indicated that corrections officers were after her, this note was properly rejected by the WCJ as hearsay, and Claimant presented absolutely no other ev-

idence, such as the testimony of the inmate, to corroborate that this actually occurred or that her fellow employees were actually conspiring against her. The WCJ mentioned Claimant's testimony regarding this note, but made no finding that corrections officers actually were conspiring against Claimant. In fact, the WCJ stated that without further evidence, he did not "have enough to have this go to the employee's conduct." (R.R. at 48a). As such, because there is no proof that this threat was an actual event that occurred and the WCJ made no such finding, Claimant was required to provide corroborative evidence in this regard. *Donovan.* Because Claimant has failed to produce such evidence, she has failed to prove that this was an abnormal working condition. *Volterano.*

■ As to Claimant's allegations that the other conditions of her job were abnormal, i.e. being moved to a less desirable position, prior case law indicates that these conditions were not abnormal. In *Wilson,* our Supreme Court stated that "[a]n employee's perception that a temporary job is demeaning is not a basis for awarding workers' compensation benefits. An employer does not have to place an employee in a position commensurate with the position or status that the employee previously held or bear the risk of a workers' compensation claim for psychic injury." *Id.* at 629, 669 A.2d at 346.

We find *Wilson* instructive in this matter. Employer, in an effort to return Claimant to work, found her a position under the supervision of Ms. Ferguson. Claimant testified that she wasn't given much work to do at this job. The evidence indicates that Employer was attempting to accommodate Claimant and return her to work, not trying to punish her. To hold that an employer creates an abnormal working condition by returning a claimant to another job without direct evidence that the employer's motives were solely for harassment of the claimant would be unwise and contrary to the goal of returning claimants to gainful employment. Additionally, Claimant only attempted to perform this position for less than a month. Therefore, Claimant certainly did not meet her burden of proving that she experienced abnormal working conditions of a longer duration. *U.S. Airways.* As such, we do not believe that this aspect of Claimant's employment was abnormal. Therefore, Claimant would not be entitled to workers' compensation benefits for any mental injury suffered as a result of these conditions.[3]

Accordingly, the order of the Board is affirmed.

### ORDER

AND NOW, February 9, 2005, the order of the Workers' Compensation Appeal Board docketed at A01–0790 and dated February 25, 2002 is hereby AFFIRMED.

■

---

3. Claimant also argues that the Board erred by failing to address the fact that Employer attempted to condition her return to work upon her signing a release of all legal claims. We fail to see how this incident alone could be considered to be so abnormal so as to entitle Claimant to the receipt of workers' compensation benefits.